

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | **Case No. 23-00386** |
| Pancakes of Hawaii, Inc., dba The Original Pancake House, | (Chapter 11)<br>(Subchapter V) |
| Debtor and<br>Debtor-in-possession | |

**STIPULATED ORDER**
**REGARDING REJECTION OF LEASE; EXHIBIT 1**

This Stipulated Order Regarding Rejection of Lease is made with reference to the following facts:

1. On May 24, 2023 ("Petition Date"), the Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Bankruptcy Code, commencing the above Chapter 11 case before the United States Bankruptcy Court for the District of Hawaii.

2.     On June 2, 2023, the Debtor filed its *Motion for Order Authorizing Debtor to Reject Lease (1221 Kapiolani)* (the "Motion").[1]  *See* dkt. # 26.  On June 20, 2023, FPA Kapiolani Associates LLC ("Landlord") filed a Position Statement on the Motion.  *See* dkt. #40.

3.     The Debtor has advised the Landlord that it has vacated the Kapiolani Location as of June 19, 2023, and the parties agree that the Kapiolani Lease shall be rejected by operation of law pursuant to 11 U.S.C. §365(d)(4).

**IT IS HEREBY ORDERED** that:

1.     The Kapiolani Lease, attached hereto as Exhibit 1 and incorporated herein by reference, shall be deemed rejected and terminated effective as of June 19, 2023, without prejudice to: (a)  any and all of the Landlord's rights and defenses relating to the Kapiolani Lease under 11 U.S.C. § 365(h) and 11 U.S.C. § 502(b)(6); and (b) all claims and counterclaims, and defenses in *FPA Kapiolani Associates LLC v. Pancakes of Hawaii, Inc.*, Adv. No. 23-90008.

2.     Landlord shall be entitled to a post-petition administrative claim under Bankruptcy Code sections 365, 502, and 503 for the period from May 24, 2023 to June 19, 2023.

3.     Notice of the Motion as provided therein shall be deemed good and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

U.S. Bankruptcy Court - Hawaii   #23-00386   Dkt # 50   Filed  06/29/23   Page 2 of 33

sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

4.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

5.     The 14-day stay provided under Fed. R. Bankr. P. 4001(a)(3) shall not apply to this Order.

6.     The Parties are authorized to take all necessary actions to effectuate the relief granted pursuant to this Order and in accordance with the Motion.

7.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the interpretation, implementation, or enforcement of this Order.

8.     This Stipulated Order shall be binding on the Parties and their successors and assigns, including but not limited to, any interim or permanent trustee if the case is converted to a case under Chapter 7 of the Bankruptcy Code.

**END OF ORDER**

U.S. Bankruptcy Court - Hawaii   #23-00386   Dkt # 50   Filed  06/29/23   Page 3 of 33

STIPULATED AND AGREED TO:

/s/ Max J. Kimura
MICHAEL A. YOSHIDA
NA LAN
MAX J. KIMURA
Attorneys for Creditor FPA KAPIOLANI ASSOCIATES
LLC, a Delaware limited liability company


/s/Allison A. Ito
CHUCK C. CHOI
ALLISON A. ITO
Attorneys for Debtor and debtor in possession


**END OF ORDER**

**SUBMITTED BY:**

CHOI & ITO
Attorneys at Law

CHUCK C. CHOI
ALLISON A. ITO
700 Bishop Street, Suite 1107
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: cchoi@hibklaw.com
aito@hibklaw.com

Attorneys for Debtor
and Debtor-in-Possession

# EXHIBIT 1

**Electronically Filed**
**FIRST CIRCUIT**
**1DRC-22-0005523**
**01-SEP-2022**
**05:28 PM**
**Dkt. 2 EXH**

LEASE

## 1221 KAPIOLANI BOULEVARD

**FPA KAPIOLANI ASSOCIATES LLC, a Delaware limited liability company**

as Landlord,

and

**PANCAKES OF HAWAII, INC., a Hawaii Corporation**

as Tenant.

EXHIBIT "A"

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | BUILDING AND PREMISES | 1 |
| 2. | LEASE TERM | 1 |
| 3. | BASE RENT | 1 |
| 4. | ADDITIONAL RENT | 1 |
| 5. | USE OF PREMISES | 3 |
| 6. | SERVICES AND UTILITIES | 3 |
| 7. | REPAIRS | 4 |
| 8. | ADDITIONS AND ALTERATIONS | 4 |
| 9. | COVENANT AGAINST LIENS | 4 |
| 10. | INSURANCE | 5 |
| 11. | DAMAGE AND DESTRUCTION | 5 |
| 12. | NONWAIVER | 6 |
| 13. | CONDEMNATION | 6 |
| 14. | ASSIGNMENT AND SUBLETTING | 6 |
| 15. | OWNERSHIP AND REMOVAL OF TRADE FIXTURES | 8 |
| 16. | HOLDING OVER | 8 |
| 17. | ESTOPPEL CERTIFICATES | 8 |
| 18. | SUBORDINATION | 8 |
| 19. | DEFAULTS; REMEDIES | 8 |
| 20. | FORCE MAJEURE | 10 |
| 21. | SECURITY DEPOSIT | 10 |
| 22. | SUBSTITUTION OF OTHER PREMISES | 10 |
| 23. | SIGNS | 10 |
| 24. | COMPLIANCE WITH LAW | 10 |
| 25. | LATE CHARGES | 10 |
| 26. | LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT | 11 |
| 27. | ENTRY BY LANDLORD | 11 |
| 28. | TENANT PARKING | 11 |
| 29. | MISCELLANEOUS PROVISIONS | 11 |

EXHIBITS

| | |
|---|---|
| A | OUTLINE OF PREMISES |
| B | TENANT WORK LETTER |
| C | NOTICE OF LEASE TERM DATES |
| D | RULES AND REGULATIONS |
| E | FORM OF TENANT'S ESTOPPEL CERTIFICATE |

Additional Rent ...............................................................................1
After-Hours HVAC ..........................................................................4
Alterations.......................................................................................4
Base Rent........................................................................................1
Base Year........................................................................................1
Building...........................................................................................1
Building Parking Facility...................................................................1
Common Areas................................................................................1
Direct Expenses..............................................................................1
Estimate..........................................................................................3
Estimate Statement.........................................................................3
Estimated Excess............................................................................3
Excess............................................................................................3
Expense Year..................................................................................1
Force Majeure................................................................................10
Hazardous Material........................................................................13
HVAC...............................................................................................3
Landlord Parties...............................................................................5
Lease Commencement Date ...........................................................1
Lease Expiration Date......................................................................1
Lease Term......................................................................................1
Notices..........................................................................................12
Operating Expenses.........................................................................1
Permitted Use..................................................................................3
Premises..........................................................................................1
Proposition 13.................................................................................2
Rent.................................................................................................1
Security Deposit.............................................................................10
Signage..........................................................................................10
Statement.........................................................................................3
Subject Space..................................................................................7
Tax Expenses...................................................................................2
Tenant's Share.................................................................................2
Transfer............................................................................................8
Transfer Notice.................................................................................7
Transfer Premium.............................................................................7
Transferee........................................................................................7
Transfers.......................................................................................7, 8

## 1221 KAPIOLANI BOULEVARD

## SUMMARY OF BASIC LEASE INFORMATION

The undersigned hereby agree to the following terms of this Summary of Basic Lease Information (the "**Summary**"). This Summary is hereby incorporated into and made a part of the attached Lease (this Summary and the Lease to be known collectively as the "**Lease**"), which pertains to the building, which is located at 1221 Kapiolani Boulevard, Honolulu, Hawaii (the "**Building**"). Each reference in the Lease to any term of this Summary shall have the meaning as set forth in this Summary for such term. In the event of a conflict between the terms of this Summary and the Lease, the terms of the Lease shall prevail. Any capitalized terms used herein and not otherwise defined herein shall have the meaning as set forth in the Lease.

## TERMS OF LEASE (References are to the Lease)

## DESCRIPTION

| | | |
|---|---|---|
| 1. | Date: | June ___, 2005. |
| 2. | Landlord: | FPA Kapiolani Associates, LLC, a Delaware limited liability company |
| 3. | Address of Landlord (Section 29.14): | c/o Trinity Property Consultants, LLC<br>23201 Lake Center Drive, Suite 201<br>Lake Forest, California 92630<br>Attn: James Estrada<br><br>with a copy to:<br><br>PM Realty Group<br>1221 Kapiolani Boulevard, Suite 530<br>Honolulu, Hawaii 96814<br>Attn: Property Management |
| 4. | Tenant: | Pancakes of Hawaii, Inc., a Hawaii Corporation |
| 5. | Address of Tenant (Section 29.14): | 1414 Dillingham Boulevard<br>Honolulu, HI 96819<br>Attention: Ms. Young Acopan |

6. Building and Premises (Article 1).

| | | |
|---|---|---|
| 6.1 | Building: | The ten (10) story office building located at 1221 Kapiolani Boulevard Street, Honolulu, Hawaii, which contains approximately 133,213 rentable square feet. |
| 6.2 | Premises: | Approximately 2,295 rentable square feet of space located on the Ground Floor of the Building, known as Suite 104, as set forth on **Exhibit A** attached hereto. |

7. Term (Article 2).

| | | |
|---|---|---|
| 7.1 | Lease Term: | Three (3) years. |
| 7.2 | Lease Commencement Date | The Lease shall commence on July 1, 2005. |
| 7.3 | Lease Expiration Date | The Lease shall terminate on June 30, 2008. |

8. Base Rent (Article 3):

| | Annual Base Rent | Monthly Installment of Base Rent | Annual Rental Rate per Rentable Square Foot |
|---|---|---|---|
| Months 1 – 12 | $16,200.00 | $1,350.00 | $7.06 |
| Months 13 – 24 | $16,686.00 | $1,390.50 | $7.27 |
| Months 25 – 36 | $17,186.64 | $1,432.22 | $7.49 |

U.S. Bankruptcy Court - Hawaii   #23-00386   Dkt # 50   Filed   06/29/23   Page 9 of 33

9. Additional Rent (Article 4):

    9.1. Direct Expenses:      Commencing on the Lease commencement date, Tenant shall pay its pro-rata share of the building's Operating Expense and Common Area Maintenance charges. Currently estimated for 2005 at $2,135.79 per month ($0.93 per rentable square foot), and subject to annual adjustment per the Lease.

    9.2. Tenant's Share of Direct Expenses:      1.72 %

10. Use (Article 5):      Sit-down family restaurant serving breakfast and lunch.

11. Security Deposit (Article 21):      $3,716.65

12. Tenant Parking (Article 28):      For the term of the Lease, Tenant shall be entitled to rent up to four (4) unreserved parking stalls in the Building's parking structure at the prevailing monthly rate, subject to change.

13. Brokers (Section 29.25):      Landlord's Agent: CB Richard Ellis Hawaii, Inc.

    Tenant's Agent: None

14. Special Conditions:

    1.      **Parking:** During the term of the lease, Landlord will permit Tenant to validate its customer parking through the use of a stamp or other acceptable method to Landlord and Tenant at the cost of $620.00 per month plus 4.166% Hawaii State GETax.

    2.      **After Hours Air Conditioning:** Tenant will pay for after hours air conditioning outside the normal business hours of operation of the building as described in Section 6.1.1, Page 3. The hourly rate will not exceed $18.96 per hour.

    3.      **Electrical Sub metering:** Tenant will be billed separately for electricity used within the premises, which are determined by a sub meter.

    4.      **Exhaust Fan:** Tenant will pay its pro-rata share of the cost to periodically clean and maintain the exhaust fan that is shared by other ground floor restaurant tenants.

    5.      **Janitorial Service:** Tenant shall be responsible for janitorial service and trash removal within the premises.

    6.      **Tenant Improvements:** Tenant to accept premises in "as is" condition. Any further improvements shall be at Tenant's sole cost and expense and subject to Landlord's prior approval.

LEASE

This Lease, which includes the preceding Summary of Basic Lease Information (the **"Summary"**) attached hereto and incorporated herein by this reference (the Lease and Summary to be known sometimes collectively hereafter as the **"Lease"**), dated as of the date set forth in <u>Section 1</u> of the Summary, is made by and between FPA Kapiolani Associates LLC, a Delaware limited liability company ("Landlord"), and Pancakes of Hawaii, Inc., a Hawaii corporation (**"Tenant"**).

**1.**      <u>BUILDING AND PREMISES</u>.  Upon and subject to the terms, covenants and conditions hereinafter set forth in this Lease, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the premises set forth in <u>Section 6</u> of the Summary (the **"Premises"**), which Premises are located in and are a part of that certain building located at 1221 Kapiolani Boulevard, Honolulu, Hawaii, 96814 and which Premises shall be deemed for all purposes to contain the amount of rentable square feet set forth in such <u>Section 6</u> of the Summary.  The Building, the parking facilities servicing the Building (collectively, the **"Building Parking Facility"**), any outside plaza areas, the land (which is improved with landscaping and other improvements), the land upon which the Building is located, and other improvements surrounding the Building which are designated from time to time by Landlord as "Common Areas," as that term is defined below, appurtenant to or servicing the Building, and the land upon which any of the foregoing are situated, are herein sometimes collectively referred to as the **"Building."**  Tenant shall have the non-exclusive right to use and enjoy in common with other tenants in the Building those portions of the Building which are provided for use in common by Tenant and any other tenants of the Building (the **"Common Areas"**).  Subject to Landlord's reasonable rules and regulations and access control procedures and the terms of this Lease, Tenant shall have the right of access to the Premises twenty-four (24) hours per day, seven (7) days per week during the "Lease Term," as that term is defined in <u>Article 2</u> of this Lease.  Except as specifically set forth in this Lease and in the Tenant Work Letter attached hereto as <u>Exhibit B</u>, Landlord shall not be obligated to provide or pay for any improvement work or services related to the improvement of the Premises.  Tenant also acknowledges that Landlord has made no representation or warranty regarding the condition of the Premises or the Building except as specifically set forth in this Lease and the Tenant Work Letter.

**2.**      <u>LEASE TERM</u>.  The terms and provisions of this Lease shall be effective as of the date of this Lease except for the provisions of this Lease relating to the payment of Rent.  The term of this Lease (the **"Lease Term"**) shall be as set forth in <u>Section 7.1</u> of the Summary and shall commence on the date (the **"Lease Commencement Date"**) set forth in <u>Section 7.2</u> of the Summary (subject to the terms of the Tenant Work Letter) and shall terminate on the date (the **"Lease Expiration Date"**) set forth in <u>Section 7.3</u> of the Summary, unless sooner terminated or extended as hereinafter provided.  For purposes of this Lease, the term "Lease Year" shall mean each consecutive twelve (12) month period during the Lease Term, provided that the last Lease Year shall end on the Lease Expiration Date.  At any time during the Lease Term, Landlord may deliver to Tenant a notice of Lease Term dates in the form as set forth in <u>Exhibit C</u>, attached hereto, which notice Tenant shall execute and return to Landlord within five (5) days of receipt thereof.

**3.**      <u>BASE RENT</u>.  Tenant shall pay, without notice or demand, except as otherwise set forth in this Lease, to Landlord at its office in the Building, check for lawful money of the United States of America, base rent (**"Base Rent"**) as set forth in <u>Section 8</u> of the Summary, payable in equal monthly installments as set forth in <u>Section 8</u> of the Summary in advance on or before the first day of each month during the Lease Term, without any setoff or deduction whatsoever, except as otherwise set forth in this Lease.  The Base Rent for the first full month of the Lease Term, which occurs after the expiration of any free rent period, shall be paid at the time of Tenant's execution of this Lease.  If any rental payment date (including the Lease Commencement Date) falls on a day of the month other than the first day of such month or if any rental payment is for a period, which is shorter than one month, then the rental for any such fractional month shall be a proportionate amount of a full calendar month's rental.  All other payments or adjustments required to be made under the terms of this Lease that require proration on a time basis shall be prorated on the same basis.

**4.**      <u>ADDITIONAL RENT</u>.

      4.1      <u>Additional Rent</u>.  In addition to paying the Base Rent specified in <u>Article 3</u> of this Lease, Tenant shall pay as additional rent Tenant's Share of the annual Direct Expenses.  Such additional rent, together with any and all other amounts payable by Tenant to Landlord pursuant to the terms of this Lease, shall be hereinafter collectively referred to as the **"Additional Rent."**  The Base Rent and Additional Rent are herein collectively referred to as the **"Rent."**  Without limitation on other obligations of Tenant, which shall survive the expiration of the Lease Term, the obligations of Tenant to pay the Additional Rent provided for in this <u>Article 4</u> shall survive the expiration of the Lease Term.

      4.2      <u>Definitions</u>.  As used in this <u>Article 4</u>, the following terms shall have the meanings hereinafter set forth:

            4.2.1      **"Direct Expenses"** shall mean "Operating Expenses" and "Tax Expenses."

            4.2.2      **"Expense Year"** shall mean each calendar year in which any portion of the Lease Term falls, through and including the calendar year in which the Lease Term expires, provided that Landlord, upon notice to Tenant, may change the Expense Year from time to time to any other twelve (12) consecutive month period, and in the event of any such change, Tenant's Share of Direct Expenses shall be equitably adjusted for any Expense Year involved in any such change.

            4.2.3      **"Operating Expenses"** shall mean all expenses, costs and amounts of every kind and nature which Landlord shall pay during any Expense Year because of or in connection with the ownership, management, maintenance, repair, replacement, restoration or operation of the Building and Common Areas, including, without limitation, any amounts paid for (i) the cost of supplying all utilities, the cost of operating, maintaining, repairing, renovating and managing the utility systems, mechanical systems, sanitary and storm drainage systems, and any escalator and/or elevator systems, and the cost of supplies and equipment and maintenance and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and inspections and the cost of contesting the validity or applicability of any governmental enactments which may affect Operating Expenses, and the costs incurred in connection with the implementation and operation of a transportation system management program or similar program; (iii) the cost of insurance carried by Landlord, in such amounts as Landlord may reasonably determine or as may be required by any applicable mortgagees; (iv) the cost of

U.S. Bankruptcy Court - Hawaii   #23-00386   Dkt # 50   Filed  06/29/23   Page 11 of 33

-1-

landscaping, relamping, and all supplies, tools, equipment and materials used in the operation, repair and maintenance of the Building; (v) the cost of parking area repair, restoration, and maintenance, including, but not limited to, resurfacing, repainting, restriping, and cleaning; (vi) fees, charges and other costs, including consulting fees, legal fees and accounting fees, of all contractors engaged by Landlord or otherwise reasonably incurred by Landlord in connection with the management, operation, maintenance and repair of the Building; (vii) any equipment rental agreements or management agreements (including the cost of any management fee and the fair rental value of any office space provided thereunder); (viii) wages, salaries and other compensation and benefits of all persons engaged in the operation, management, maintenance or security of the Building, and employer's Social Security taxes, unemployment taxes or insurance, and any other taxes which may be levied on such wages, salaries, compensation and benefits; provided, that if any employees of Landlord provide services for more than one building of Landlord, then a prorated portion of such employees' wages, benefits and taxes shall be included in Operating Expenses based on the portion of their working time devoted to the Building; (ix) payments under any easement, license, operating agreement, declaration, restrictive covenant, underlying or ground lease (excluding rent), or instrument pertaining to the sharing of costs by the Building; (x) operation, repair, maintenance and replacement of all systems and equipment, and components thereof of the Building; (xi) the cost of janitorial service, alarm and security service, window cleaning, trash removal, replacement of wall and floor coverings, ceiling tiles and fixtures in lobbies, corridors, restrooms and other common or public areas or facilities, maintenance and replacement of curbs and walkways, repair to roofs and re-roofing; (xii) amortization (including interest on the unamortized cost) of the cost of acquiring or the rental expense of personal property used in the maintenance, operation and repair of the Building; and (xiii) the cost of any capital improvements or other costs (A which are intended as a labor-saving device or to effect other economies in the operation or maintenance of the Building, (B) made to the Building that are required under any governmental law or regulation, or (C) which are reasonably determined by Landlord to be in the best interest of the Building; provided, however, that if any such cost described in (A), (B) or (C), above, is a capital expenditure, such cost shall be amortized (including interest on the unamortized cost) over its useful life as Landlord shall reasonably determine. If Landlord is not furnishing any particular work or service (the cost of which, if performed by Landlord, would be included in Operating Expenses) to a tenant who has undertaken to perform such work or service in lieu of the performance thereof by Landlord, Operating Expenses shall be deemed to be increased by an amount equal to the additional Operating Expenses which would reasonably have been incurred during such period by Landlord if it had at its own expense furnished such work or service to such tenant. If the Building is not fully occupied during all or a portion of any Expense Year, Landlord shall make an appropriate adjustment to the variable components of Operating Expenses for such year or applicable portion thereof, employing sound accounting and management principles, to determine the amount of Operating Expenses that would have been paid had the Building been fully occupied; and the amount so determined shall be deemed to have been the amount of Operating Expenses for such year, or applicable portion thereof.

    4.2.4  "Tax Expenses" shall mean all federal, state, county, or local governmental or municipal taxes, fees, charges or other impositions of every kind and nature, whether general, special, ordinary or extraordinary (including, without limitation, real estate taxes, general and special assessments, special assessment district payments, transit taxes, leasehold taxes or taxes based upon the receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent, unless required to be paid by Tenant, personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, systems and equipment, appurtenances, furniture and other personal property used in connection with the Building), which Landlord shall pay because of or in connection with the ownership, leasing and operation of the Building or Landlord's interest therein. Tax Expenses shall include, without limitation: (i) any tax on Landlord's rent, right to rent or other income from the Building or as against Landlord's business of leasing any of the Building; (ii) any assessment, tax, fee, levy or charge in addition to, or in substitution, partially or totally, of any assessment, tax, fee, levy or charge previously included within the definition of Building tax. It is the intention of Tenant and Landlord that all such new and increased assessments, taxes, fees, levies, and charges and all similar assessments, taxes, fees, levies and charges be included within the definition of Tax Expenses for purposes of this Lease; (iii) any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises or the rent payable hereunder, including, without limitation, any gross income tax with respect to the receipt of such rent, or upon or with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof; and (iv) Any assessment, tax, fee, levy or charge, upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises.

    4.2.5  "Tenant's Share" shall mean the percentage set forth in <u>Section 9</u> of the Summary.

  4.3  <u>Allocation of Direct Expenses – Cost Pools</u>. Landlord shall have the right, from time to time, to equitably allocate some or all of the Direct Expenses for the Project among different portions or occupants of the Building (the "**Cost Pools**"), in Landlord's reasonable discretion. Such cost Pools may include, but shall not be limited to, the office space tenants of the Building, and the industrial space tenants of the Building. The Direct Expenses within each such Cost Pool shall be allocated and charged to the tenants within such Cost Pool in an equitable manner.

  4.4  <u>Calculation and Payment of Additional Rent</u>.

    4.4.1  <u>Calculation of Excess and Underage</u>. Tenant shall pay to Landlord, in the manner set forth in <u>Section 4.4.2</u>, below, and as Additional Rent, Tenant's Share of Direct Expenses for each Expense Year.

    4.4.2  <u>Statement of Actual Direct Expenses and Payment by Tenant</u>. Following the end of each Expense Year, Landlord shall give to Tenant a statement (the "**Statement**") which shall state in general major categories the Building Direct Expenses incurred or accrued for such preceding Expense Year, and which shall indicate the amount of Tenant's Share of Direct Expenses. Upon receipt of the Statement for each Expense Year commencing or ending during the Lease Term, Tenant shall pay, within thirty (30) days after receipt of the Statement, the full amount of Tenant's Share of Direct Expenses for such Expense Year, less the amounts, if any, paid during such Expense Year as "Estimated Direct Expenses," as that term is defined in <u>Section 4.4.3</u>, below, and if Tenant paid more as Estimated Direct Expenses than the actual Tenant's Share of Direct Expenses (an "**Excess**"), Tenant shall receive a credit in the amount of such Excess against Rent next due under this Lease. The failure of Landlord to timely furnish the Statement for any Expense Year shall not prejudice Landlord or Tenant from enforcing its rights under this <u>Article 4</u>. Even though the Lease Term has expired and Tenant has vacated the Premises, when the final determination is made of Tenant's Share of Direct Expenses for the Expense Year in which this Lease terminates, if Tenant's Share of Direct Expenses is greater than the amount of Estimated Direct Expenses previously paid by Tenant to Landlord, Tenant shall, within thirty (30) days after receipt of the Statement, pay to Landlord such amount, and if Tenant paid more as Estimated Direct Expenses than the actual Tenant's Share of Direct Expenses (again, an Excess), Landlord shall, within thirty (30) days, deliver a check payable to Tenant in the amount of such Excess. The provisions of this <u>Section 4.4.2</u> shall survive the expiration or earlier termination of the Lease Term.

4.4.3    Statement of Estimated Direct Expenses.  Landlord, at Landlord's option, may elect to give Tenant a yearly estimate statement (the "**Estimate Statement**"), which Estimate Statement shall set forth Landlord's reasonable estimate (the "**Estimate**") of what the total amount of Direct Expenses for the then-current Expense Year shall be and the estimated Tenant's Share of Direct Expenses (the "**Estimated Direct Expenses**"). The failure of Landlord to timely furnish the Estimate Statement for any Expense Year shall not preclude Landlord from enforcing its rights to collect any Estimated Direct Expenses under this Article 4, nor shall Landlord be prohibited from revising any Estimate Statement or Estimated Direct Expenses theretofore delivered to the extent necessary. Thereafter, Tenant shall pay, within thirty (30) days after receipt of the Estimate Statement, a fraction of the Estimated Direct Expenses for the then-current Expense Year (reduced by any amounts paid pursuant to the last sentence of this Section 4.4.3).  Such fraction shall have as its numerator the number of months which have elapsed in such current Expense Year to the month of such payment, both months inclusive, and shall have twelve (12) as its denominator.  Until a new Estimate Statement is furnished, Tenant shall pay monthly, with the monthly Base Rent installments, an amount equal to one-twelfth (1/12) of the total Estimated Direct Expenses set forth in the previous Estimate Statement delivered by Landlord to Tenant.

4.5    Taxes and Other Charges for Which Tenant Is Directly Responsible.

4.5.1    Tenant shall be liable for and shall pay ten (10) days before delinquency, taxes levied against Tenant's equipment, furniture, fixtures and any other personal property located in or about the Premises.  If any such taxes on Tenant's equipment, furniture, fixtures and any other personal property are levied against Landlord or Landlord's property or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such equipment, furniture, fixtures or any other personal property and if Landlord pays the taxes based upon such increased assessment, which Landlord shall have the right to do regardless of the validity thereof but only under proper protest if requested by Tenant, Tenant shall upon demand repay to Landlord the taxes so levied against Landlord or the proportion of such taxes resulting from such increase in the assessment, as the case may be.

4.5.2    If the tenant improvements in the Premises, whether installed and/or paid for by Landlord or Tenant and whether or not affixed to the real property so as to become a part thereof, are assessed for real property tax purposes at a valuation higher than the valuation at which tenant improvements conforming to Landlord's "building standard" in other space in the Building are assessed, then the Tax Expenses levied against Landlord or the property by reason of such excess assessed valuation shall be deemed to be taxes levied against personal property of Tenant and shall be governed by the provisions of Section 4.4.1, above.

4.5.3    Notwithstanding any contrary provision herein, Tenant will pay to Landlord as Additional Rent, at the time and together with each payment of Base Rent, Additional Rent and other charges required under this Lease to be made by Tenant to Landlord which are subject to the State of Hawaii general excise tax on gross income, as the same may be amended, and all other similar taxes imposed upon Landlord with respect to rental or other payments in the nature of a gross receipts tax, sales tax, privilege tax or the like, excluding federal or state net income taxes, imposed by any governmental authority, an amount which when added to such rent or other payment (whether actually or constructively received by Landlord) shall yield to Landlord after deduction of all such tax payable by Landlord with respect to all such payments a net amount which Landlord would have realized from such payment had no such tax been imposed.  It is the intent of this Section 4.5 and of the other provisions of this Lease to ensure that the rent and other payments to Landlord by Tenant will be received by Landlord without diminution by any tax, assessment, charge, or levy of any nature whatsoever, except United States and State of Hawaii net income taxes, and the terms and conditions of this Lease shall be liberally construed to effect such purpose.

**5.**    **USE OF PREMISES**.  Tenant shall use the premises only for the purpose as set forth in Section 10 of the Summary (the "**Permitted Use**") and for no other use or purpose, unless first approved in writing by Landlord, which approval Landlord may withhold in its sole discretion.  Tenant agrees that it shall not use, or permit any person to use, the Premises or any part thereof for any use or purpose contrary to the provisions of the Rules and Regulations set forth in Exhibit D, attached hereto, or in violation of the laws of the United States of America, the State of Hawaii, or the ordinances, regulations or requirements of any local, municipal or county governing body or other lawful authorities having jurisdiction over the Building.  Tenant shall comply with all recorded covenants, conditions, and restrictions, now or hereafter affecting the Building.  Tenant shall not use or allow another person or entity to use any part of the Premises or the Building for the storage, use, treatment, manufacture or sale of hazardous materials or hazardous substances (as defined under applicable laws).

**6.**    **SERVICES AND UTILITIES**.

6.1    Standard Tenant Services.  Landlord shall provide the following services and utilities twenty-four (24) hours per day on every day during the Lease Term, unless otherwise stated below.

6.1.1    Subject to reasonable change implemented by Landlord and all governmental rules, regulations and guidelines applicable thereto, Landlord shall provide air conditioning when necessary for normal comfort for normal use in the Premises ("HVAC") from Monday through Friday from 8 a.m. to 6 p.m., and on Saturday from 8:00 a.m. to 2:00 p.m., except for the date of observation of locally and nationally recognized holidays (collectively, the "**Holidays**").  The daily time periods identified hereinabove are sometimes referred to as the "Business Hours."

6.1.2    Landlord shall provide adequate electrical wiring and facilities for connection to Tenant's lighting fixtures and incidental use equipment, provided that (i) the connected electrical load of the incidental use equipment does not exceed an average of three (3) watts per usable square foot of the Premises during each of the Building Hours on a monthly basis (i.e., the total of watts per usable square foot allocable to such incidental use equipment during a given month divided by the number of Business Hours that occur during such given month shall not exceed three (3) watts per usable square foot), and the electricity so furnished for incidental use equipment will be at a nominal one hundred twenty (120) volts and no electrical circuit for the supply of such incidental use equipment will require a current capacity exceeding twenty (20) amperes, and (ii) the connected electrical load of Tenant's lighting fixtures does not exceed an average of one (1) watt per usable square foot of the Premises during the Building Hours on a monthly basis, and the electricity so furnished for Tenant's lighting will be at a nominal two hundred seventy-seven (277) volts, which electrical usage shall be subject to applicable laws and regulations, including Title 24.  Tenant shall bear the cost of replacement of lamps, starters and ballasts for non-Building standard lighting fixtures and non-tubular fluorescent bulbs within the Premises.  Landlord shall also provide (i) city water for use in connection with any plumbing fixtures now or hereafter installed in the Premises and the Building in accordance with this Lease, and (ii) nonexclusive automatic passenger elevator service at all times.

U.S. Bankruptcy Court - Hawaii   #23-00386   Dkt # 50   Filed 06/29/23   Page 13 of 33

6.1.3    Notwithstanding anything to the contrary set forth in this Lease, Tenant shall pay for all utilities (including without limitation, electricity, gas, sewer and water) attributable to its use of the entire Premises and shall also provide its own janitorial and security services for the Building. Such utility use shall include electricity, water, and gas use for lighting, incidental use and HVAC. All such utility, janitorial and security payments shall be excluded from Operating Expenses and shall be paid directly by Tenant prior to the date on which the same are due to the utility provider janitorial company and/or security company, as applicable. Landlord shall, to the extent reasonably practicable and at Tenant's cost, separately meter the Premises, and shall otherwise equitably determine Tenant's use of such utilities.

6.1.4    If Tenant uses electricity, water or heat or air conditioning in excess of that supplied by Landlord pursuant to Section 6.1 of this Lease, Tenant shall pay to Landlord, upon billing, the cost of the installation, operation, and maintenance of equipment which is installed in order to supply such excess consumption, and the cost of the increased wear and tear on existing equipment caused by such excess consumption; and Landlord may install devices to separately meter any increased use and in such event Tenant shall pay the increased cost directly to Landlord, on demand, including the cost of such additional metering devices. Landlord reserves the right to increase . the hours or days during which air conditioning, heating and ventilation are provided to the Premises and the Building to accommodate the usage by tenants occupying two-thirds or more of the rentable square feet of the Building or to conform to practices of other buildings in the area comparable to the Building.

6.2    After-Hours Use. Upon reasonable prior notice by Tenant from time to time, Landlord shall provide heat, ventilation and cooling adequate for the comfortable use and occupancy of the Premises outside Business Hours (the "After-Hours HVAC"). Tenant shall pay Landlord within thirty (30) days of demand for any such After-Hours HVAC at the hourly cost established by Landlord for such After-Hours HVAC.

6.3    Interruption of Use. Tenant agrees that Landlord shall not be liable for damages, by abatement of rent or otherwise, for failure to furnish or delay in furnishing any service (including telephone and telecommunication services), or for any diminution in the quality or quantity thereof, when such failure or delay or diminution is occasioned, in whole or in part, by repairs, replacements, or improvements, by any strike, lockout or other labor trouble, by inability to secure electricity, gas, water, or other fuel at the Building after reasonable effort to do so, by any accident or casualty whatsoever, by act or default of Tenant or other parties, or by any other cause; and such failures or delays or diminution shall never be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from paying rent or performing any of its obligations under this Lease. Furthermore, Landlord shall not be liable under any circumstances for a loss of, or injury to, property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in connection with or incidental to a failure to furnish any services or utilities.

6.4    Additional Services. Landlord shall have the exclusive right, but not the obligation, to provide any additional services which may be required by Tenant, including, without limitation, locksmithing, lamp replacement, additional janitorial service, and additional repairs and maintenance, provided that Tenant shall pay to Landlord upon billing, the sum of all costs to Landlord of such additional services, plus an administration fee. Charges for any service for which Tenant is required to pay from time to time hereunder, shall be deemed Additional Rent hereunder and shall be billed on a monthly basis.

7.    REPAIRS. Tenant shall, at Tenant's own expense, keep the Premises, including all improvements, fixtures, equipment, window coverings, and furnishings therein, in good order, repair and condition at all times during the Lease Term. In addition, Tenant shall, at Tenant's own expense but under the supervision and subject to the prior approval of Landlord, and within any reasonable period of time specified by Landlord, promptly and adequately repair all damage to the Premises and replace or repair all damaged or broken fixtures and appurtenances; provided however, that, at Landlord's option, or if Tenant fails to make such repairs, Landlord may, but need not, make such repairs and replacements, and Tenant shall pay Landlord the cost thereof, including a percentage of the cost thereof (to be uniformly established for the Building) sufficient to reimburse Landlord for all overhead, general conditions, fees and other costs or expenses arising from Landlord's involvement with such repairs and replacements forthwith upon being billed for same. Landlord may, but shall not be required to, enter the Premises at all reasonable times to make such repairs, alterations, improvements and additions to the Premises or to the Building or to any equipment located in the Building as Landlord shall desire or deem necessary or as Landlord may be required to do by governmental or quasi-governmental authority or court order or decree.

8.    ADDITIONS AND ALTERATIONS. Tenant may not make any improvements, alterations, additions or changes to the Premises (collectively, the "Alterations") during the Lease Term without the consent of Landlord, which consent may be granted, withheld or conditioned in the sole and absolute discretion of Landlord. All improvements, fixtures and/or equipment which currently exist or may be installed or placed in or about the Premises, and all signs installed in, on or about the Premises, from time to time, shall be and become the property of Landlord, except that Tenant may remove any improvements, fixtures and/or equipment which Tenant can substantiate to Landlord have not been paid for with any tenant improvement allowance funds provided to Tenant by Landlord, provided Tenant repairs any damage to the Premises and Building caused by such removal.

9.    COVENANT AGAINST LIENS. Tenant has no authority or power to cause or permit any lien or encumbrance of any kind whatsoever, whether created by act of Tenant, operation of law or otherwise, to attach to or be placed upon the Building or Premises, and any and all liens and encumbrances created by Tenant shall attach to Tenant's interest only. Landlord shall have the right at all times to post and keep posted on the Premises any notice which it deems necessary for protection from such liens. Tenant covenants and agrees not to suffer or permit any lien of mechanics or materialmen or others to be placed against the Building or the Premises with respect to work or services claimed to have been performed for or materials claimed to have been furnished to Tenant or the Premises, and, in case of any such lien attaching or notice of any lien, Tenant covenants and agrees to cause it to be immediately released and removed of record. Notwithstanding anything to the contrary set forth in this Lease, in the event that such lien is not released and removed on or before the date notice of such lien is delivered by Landlord to Tenant, Landlord, at its sole option, may immediately take all action necessary to release and remove such lien, without any duty to investigate the validity thereof, and all sums, costs and expenses, including reasonable attorneys' fees and costs, incurred by Landlord in connection with such lien shall be deemed Additional Rent under this Lease and shall immediately be due and payable by Tenant.

## 10. INSURANCE.

10.1    _Indemnification and Waiver_. To the extent not prohibited by law, Landlord, its members, partners and their respective officers, agents, servants, employees, and independent contractors (collectively, "Landlord **Parties**") shall not be liable for any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming through Tenant. Tenant shall indemnify, defend, protect, and hold harmless Landlord Parties from any and all loss, cost, damage, expense and liability (including without limitation court costs and reasonable attorneys' fees) incurred in connection with or arising from (i) any cause in, on or about the Premises, and (ii) any acts, omissions or negligence of Tenant or of any person claiming by, through or under Tenant, or of the contractors, agents, servants, employees, invitees, guests or licensees of Tenant or any such person, in, on or about the Building, in either event either prior to, during, or after the expiration of the Lease Term, provided that the terms of the foregoing indemnity shall not apply to the gross negligence or willful misconduct of Landlord. The provisions of this _Section 10.1_ shall survive the expiration or sooner termination of this Lease with respect to any claims or liability occurring prior to such expiration or termination.

10.2    _Tenant's Compliance with Landlord's Fire and Casualty Insurance_. Tenant shall, at Tenant's expense, comply as to the Premises with all insurance company requirements pertaining to the use of the Premises. If Tenant's conduct or use of the Premises causes any increase in the premium for such insurance policies, then Tenant shall reimburse Landlord for any such increase. Tenant, at Tenant's expense, shall comply with all rules, orders, regulations or requirements of the American Insurance Association (formerly the National Board of Fire Underwriters) and with any similar body.

10.3    _Tenant's Insurance_. Tenant shall maintain Commercial General Liability Insurance covering the insured against claims of bodily injury, personal injury and property damage arising out of Tenant's operations, assumed liabilities or use of the Premises, including a Broad Form Commercial General Liability endorsement covering the insuring provisions of this Lease and the performance by Tenant of the indemnity agreements set forth in _Section 10.1_ of this Lease, for limits of liability not less than $1,000,000.00 for each occurrence and $2,000,000.00 annual aggregate, with 0% Insured's participation. In addition, Tenant shall carry Physical Damage Insurance covering (i) all office furniture, trade fixtures, office equipment, merchandise and all other items of Tenant's property on the Premises installed by, for, or at the expense of Tenant, and (ii) all existing and/or future tenant improvements, alterations and additions to the Premises, including any improvements, alterations or additions installed at Tenant's request above the ceiling of the Premises or below the floor of the Premises. Such insurance shall be written on an "all risks" of physical loss or damage basis, for the full replacement cost value new without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance and shall include a vandalism and malicious mischief endorsement, sprinkler leakage coverage and earthquake sprinkler leakage coverage.

10.4    _Form of Policies_. The minimum limits of policies of insurance required of Tenant under this Lease shall in no event limit the liability of Tenant under this Lease. Such insurance shall (i) name Landlord, and any other party it so specifies, as an additional insured; (ii) specifically cover the liability assumed by Tenant under this Lease, including, but not limited to, Tenant's obligations under _Section 10.1_ of this Lease; (iii) be issued by an insurance company having a rating of not less than A-VIII in Best's Insurance Guide or which is otherwise acceptable to Landlord and licensed to do business in the state in which the Building is located; (iv) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord is excess and is non-contributing with any insurance requirement of Tenant; (v) provide that said insurance shall not be canceled or coverage changed unless thirty (30) days' prior written notice shall have been given to Landlord and any mortgagee. Tenant shall deliver said policy or policies or certificates thereof to Landlord on or before the Lease Commencement Date  and at least thirty (30) days before the expiration dates thereof. In the event Tenant shall fail to procure such insurance, or to deliver such policies or certificate, Landlord may, at its option, procure such policies for the account of Tenant, and the cost thereof shall be paid to Landlord as Additional Rent within five (5) days after delivery to Tenant of bills therefor.

10.5    _Subrogation_. Landlord and Tenant agree to have their respective insurance companies issuing property damage insurance waive any rights of subrogation that such companies may have against Landlord or Tenant, as the case may be, so long as the insurance carried by Landlord and Tenant, respectively, is not invalidated thereby. As long as such waivers of subrogation are contained in their respective insurance policies, Landlord and Tenant hereby waive any right that either may have against the other on account of any loss or damage to their respective property to the extent such loss or damage is insurable under policies of insurance for fire and all risk coverage, theft, public liability, or other similar insurance.

10.6    _Additional Insurance Obligations_. Tenant shall carry and maintain during the entire Lease Term, at Tenant's sole cost and expense, increased amounts of the insurance required to be carried by Tenant pursuant to this _Article 10_, and such other reasonable types of insurance coverage and in such reasonable amounts covering the Premises and Tenant's operations therein, as may be reasonably requested by Landlord.

## 11. DAMAGE AND DESTRUCTION.

11.1    _Repair of Damage to Premises by Landlord_. If the Premises or any common areas of the Building serving or providing access to the Premises shall be damaged by fire or other casualty, Landlord shall promptly and diligently, subject to reasonable delays for insurance adjustment or other matters beyond Landlord's reasonable control, and subject to all other terms of this _Article 11_, restore the base, shell and core of the Premises and such common areas. Such restoration shall be to substantially the same condition of the base, shell and core of the Premises and common areas prior to the casualty, except for modifications required by zoning and building codes and other laws or by the holder of a mortgage on the Building, or any other modifications to the common areas deemed desirable by Landlord, provided access to the Premises and any common restrooms serving the Premises shall not be materially impaired. Notwithstanding any other provision of this Lease, upon the occurrence of any damage to the Premises, Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's insurance carried under _Section 10.3_ of this Lease, and Landlord shall repair any injury or damage to the tenant improvements installed in the Premises and shall return such tenant improvements to their original condition; provided that if the cost of such repair by Landlord exceeds the amount of insurance proceeds received by Landlord from Tenant's insurance carrier, as assigned by Tenant, the cost of such repairs shall be paid by Tenant to Landlord prior to Landlord's repair of the damage. In connection with such repairs and replacements, Tenant shall, prior to the commencement of construction, submit to Landlord, for Landlord's review and approval, all plans, specifications and working drawings relating thereto, and Landlord shall select the contractors to perform such improvement work. Landlord shall not be liable for any inconvenience or annoyance to Tenant or its visitors, or injury to Tenant's business resulting in any way from such damage or the repair thereof; provided however, that if such fire or other casualty shall have damaged the Premises or common areas necessary to Tenant's

occupancy, and if such damage is not the result of the wilful misconduct of Tenant or Tenant's employees, contractors, licensees, or invitees, Landlord shall allow Tenant a proportionate abatement of Rent, during the time and to the extent the Premises are unfit for occupancy for the purposes permitted under this Lease, and not occupied by Tenant as a result thereof.

       11.2    <u>Landlord's Option to Repair</u>. Notwithstanding the terms of <u>Section 11.1</u> of this Lease, Landlord may elect not to rebuild and/or restore the Premises and/or Building and instead terminate this Lease by notifying Tenant in writing of such termination within sixty (60) days after the date of discovery of such damage, such notice to include a termination date giving Tenant ninety (90) days to vacate the Premises, but Landlord may so elect only if the Building shall be damaged by fire or other casualty or cause, whether or not the Premises are affected, and one or more of the following conditions is present: (i) repairs cannot reasonably be completed within one hundred eighty (180) days of the date of discovery of damage (when such repairs are made without the payment of overtime or other premiums); (ii) the holder of any mortgage on the Building shall require that the insurance proceeds or any portion thereof be used to retire the mortgage debt; or (iii) the damage is not fully covered, except for deductible amounts, by Landlord's insurance policies. In addition, in the event that the Premises or the Building or the Project is destroyed or damaged by any substantial extent during the last twelve (12) months of the Lease Term, then notwithstanding anything contained in this <u>Article 11</u>, Landlord shall have the option to terminate this Lease by giving written notice to Tenant of the exercise of such option within thirty (30) days after the date of such damage or destruction, in which event this Lease shall cease and terminate as of the date of such notice. Upon any such termination of this Lease pursuant to this <u>Section 11.2</u>, Tenant shall pay the Base Rent and Additional Rent, properly apportioned up to such date of termination, and both parties hereto shall thereafter be freed and discharged of all further obligations hereunder, except as provided for in provisions of this Lease which by their terms survive the expiration or earlier termination of the Lease Term.

       11.3    <u>Waiver of Statutory Provisions</u>. The provisions of this Lease, including this <u>Article 11</u>, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises, the Building or any other portion of the Building, and any statute or regulation of the State of Hawaii with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any other statute or regulation, now or hereafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises, the Building or any other portion of the Building.

12.      <u>NONWAIVER</u>. No waiver of any provision of this Lease shall be implied by any failure of Landlord to enforce any remedy on account of the violation of such provision, even if such violation shall continue or be repeated subsequently, any waiver by Landlord of any provision of this Lease may only be in writing, and no express waiver shall affect any provision other than the one specified in such waiver and that one only for the time and in the manner specifically stated. No receipt of monies by Landlord from Tenant after the termination of this Lease shall in any way alter the length of the Lease Term or of Tenant's right of possession hereunder or after the giving of any notice shall reinstate, continue or extend the Lease Term or affect any notice given Tenant prior to the receipt of such monies, it being agreed that after the service of notice or the commencement of a suit or after final judgment for possession of the Premises, Landlord may receive and collect any Rent due, and the payment of said Rent shall not waive or affect said notice, suit or judgment.

13.      <u>CONDEMNATION</u>. If the whole or any part of the Premises or Building shall be taken by power of eminent domain or condemned by any competent authority for any public or quasi-public use or purpose, or if any adjacent property or street shall be so taken or condemned, or reconfigured or vacated by such authority in such manner as to require the use, reconstruction or remodeling of any part of the Premises or Building, or if Landlord shall grant a deed or other instrument in lieu of such taking by eminent domain or condemnation, Landlord shall have the option to terminate this Lease upon ninety (90) days' notice, provided such notice is given no later than one hundred eighty (180) days after the date of such taking, condemnation, reconfiguration, vacation, deed or other instrument. If more than twenty-five percent (25%) of the rentable square feet of the Premises is taken, or if access to the Premises is substantially impaired, Tenant shall have the option to terminate this Lease upon ninety (90) days' notice, provided such notice is given no later than one hundred eighty (180) days after the date of such taking. Landlord shall be entitled to receive the entire award or payment in connection therewith, except that Tenant shall have the right to file any separate claim available to Tenant for any taking of Tenant's personal property and fixtures belonging to Tenant and removable by Tenant upon expiration of the Lease Term pursuant to the terms of this Lease, and for moving expenses, so long as such claim does not diminish the award available to Landlord or its mortgagee, and such claim is payable separately to Tenant. All Rent shall be apportioned as of the date of such termination, or the date of such taking, whichever shall first occur. If any part of the Premises shall be taken, and this Lease shall not be so terminated, the Rent shall be proportionately abated.

14.      <u>ASSIGNMENT AND SUBLETTING</u>.

       14.1    <u>Transfers</u>. Tenant shall not, without the prior written consent of Landlord, (i) assign, mortgage, pledge, hypothecate, encumber, or to permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, (ii) permit any assignment or other such foregoing transfer of this Lease or any interest hereunder by operation of law, (iii) sublet the Premises or any part thereof, or (iv) otherwise permit the use of the Premises by any persons other than Tenant and its employees (all of the foregoing are hereinafter sometimes referred to collectively as "**Transfers**" and any person to whom any Transfer is made or sought to be made is hereinafter sometimes referred to as a "**Transferee**"). To request Landlord's consent to any Transfer, Tenant shall notify Landlord in writing, which notice (the "**Transfer Notice**") shall include (A) the proposed effective date of the Transfer, which shall not be less than forty-five (45) days after the date of delivery of the Transfer Notice, (B) a description of the portion of the Premises to be transferred (the "**Subject Space**"), (C) all of the terms of the proposed Transfer and the consideration therefor, including a calculation of the "Transfer Premium," as that term is defined in <u>Section 14.3</u> below, in connection with such Transfer, the name and address of the proposed Transferee, and a copy of all existing and/or proposed documentation pertaining to the proposed Transfer, including all existing operative documents to be executed to evidence such Transfer or the agreements incidental or related to such Transfer, (D) current financial statements of the proposed Transferee certified by an officer, partner or owner thereof, and any other information required by Landlord, which will enable Landlord to determine the financial responsibility, character, and reputation of the proposed Transferee, nature of such Transferee's business and proposed use of the Subject Space, and such other information as Landlord may reasonably require, and (E) any proposed sublease document, if applicable, which sublease document shall contain language stating that in the event Landlord and Tenant terminate this Lease for any reason or for no reason, such subtenant acknowledges and agrees that the sublease shall automatically terminate and be of no further force or effect. Any Transfer made without Landlord's prior written consent shall, at Landlord's

U.S. Bankruptcy Court - Hawaii  #23-00386  Dkt # 50  Filed  06/29/23  Page 16 of 33

option, be null, void and of no effect, and shall, at Landlord's option, constitute a default by Tenant under this Lease. Whether or not Landlord shall grant consent, Tenant shall pay Landlord's review and processing fees, as well as any reasonable legal fees incurred by Landlord, within thirty (30) days after written request by Landlord.

14.2 Landlord's Consent. Landlord shall not unreasonably withhold its consent to any proposed Transfer of the Subject Space to the Transferee on the terms specified in the Transfer Notice. The parties hereby agree that it shall be reasonable under this Lease and under any applicable law for Landlord to withhold consent to any proposed Transfer where one or more of the following apply, without limitation as to other reasonable grounds for withholding consent:

14.2.1 The Transferee is of a character or reputation or engaged in a business which is not consistent with the quality of the Building, or would be a significantly less prestigious occupant of the Building than Tenant;

14.2.2 The Transferee intends to use the Subject Space for purposes which are not permitted under this Lease;

14.2.3 The Transferee is either a governmental agency or instrumentality thereof;

14.2.4 The Transferee is not a party of reasonable financial worth and/or financial stability in light of the responsibilities involved under the Lease on the date consent is requested; or

14.2.5 The proposed Transfer would cause Landlord to be in violation of another lease or agreement to which Landlord is a party, or would give an occupant of the Building a right to cancel its lease;

14.2.6 The terms of the proposed Transfer will allow the Transferee to exercise a right of renewal, right of expansion, right of first offer, or other similar right held by Tenant (or will allow the Transferee to occupy space leased by Tenant pursuant to any such right);

14.2.7 Either the proposed Transferee, or any person or entity which directly or indirectly, controls, is controlled by, or is under common control with, the proposed Transferee, (i) occupies space in the Building at the time of the request for consent, (ii) is negotiating with Landlord to lease space in the Building at such time, or (iii) has negotiated with Landlord during the twelve (12)-month period immediately preceding the Transfer Notice.

If Landlord consents to any Transfer pursuant to the terms of this Section 14.2 (and does not exercise any recapture rights Landlord may have under Section 14.4 of this Lease), Tenant may within six (6) months after Landlord's consent, but not later than the expiration of said six-month period, enter into such Transfer of the Premises or portion thereof, upon substantially the same terms and conditions as are set forth in the Transfer Notice furnished by Tenant to Landlord pursuant to Section 14.1 of this Lease. Notwithstanding Landlord's consent to any sublease pursuant to this Article 14, in the event Landlord and Tenant elect to terminate this Lease for any reason or for no reason, any such sublease shall automatically terminate and be of no further force or effect.

14.3 Transfer Premium. If Landlord consents to a Transfer, as a condition thereto which the parties hereby agree is reasonable, Tenant shall pay to Landlord any "Transfer Premium," as that term is defined in this Section 14.3, received by Tenant from such Transferee. "Transfer Premium" shall mean all rent, additional rent or other consideration payable by such Transferee in excess of the Rent and Additional Rent payable by Tenant under this Lease on a per rentable square foot basis if less than all of the Premises is transferred. "Transfer Premium" shall also include, but not be limited to, key money and bonus money paid by Transferee to Tenant in connection with such Transfer, and any payment in excess of fair market value for services rendered by Tenant to Transferee or for assets, fixtures, inventory, equipment, or furniture transferred by Tenant to Transferee in connection with such Transfer.

14.4 Landlord's Option as to Subject Space. Notwithstanding anything to the contrary contained in this Article 14, Landlord shall have the option, by giving written notice to Tenant within thirty (30) days after receipt of any Transfer Notice, to recapture the Subject Space. Such recapture notice shall cancel and terminate this Lease with respect to the Subject Space as of the effective date of the proposed Transfer until the last day of the term of the Transfer as set forth in the Transfer Notice. In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Premises, the Rent reserved herein shall be prorated on the basis of the number of rentable square feet retained by Tenant in proportion to the number of rentable square feet contained in the Premises, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either party, the parties shall execute written confirmation of the same.

14.5 Effect of Transfer. If Landlord consents to a Transfer, (i) the terms and conditions of this Lease shall in no way be deemed to have been waived or modified, (ii) such consent shall not be deemed consent to any further Transfer by either Tenant or a Transferee, (iii) Tenant shall deliver to Landlord, promptly after execution, an original executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, (iv) Tenant shall furnish upon Landlord's request a complete statement, certified by an independent certified public accountant, or Tenant's chief financial officer, setting forth in detail the computation of any Transfer Premium Tenant has derived and shall derive from such Transfer, (v) no Transfer relating to this Lease or agreement entered into with respect thereto, whether with or without Landlord's consent, shall relieve Tenant or any guarantor of the Lease from liability under this Lease, and (vi) such assignment or sublease shall expressly provide that Tenant and assignee or subtenant are jointly and severally liable for the payment of all sums due under this Lease and the performance and observance of all the agreements, covenants, conditions and provisions to be performed and observed by Tenant under this Lease as and when performance and observance are due and that Landlord shall have the right to enforce such agreements, covenants, conditions and provisions directly against Tenant and the proposed Transferee, and each of them. Tenant shall have the duty and responsibility to take such actions to ensure that such proposed Transferee fully complies with all of the terms and provisions of this Lease. Landlord or its authorized representatives shall have the right at all reasonable times to audit the books, records and papers of Tenant relating to any Transfer, and shall have the right to make copies thereof. If the Transfer Premium respecting any Transfer shall be found understated, Tenant shall, within thirty (30) days after demand, pay the deficiency and Landlord's costs of such audit, and if understated by more than ten percent (10%), Landlord shall have the right to cancel this Lease upon thirty (30) days' notice to Tenant.

14.6 Additional Transfers. For purposes of this Lease, the term "Transfer" shall also include (i) if Tenant is a partnership, the withdrawal or change, voluntary, involuntary or by operation of law, of twenty-five percent (25%) or more of the partners, or transfer of twenty-five percent or more of partnership interests, within a twelve (12)-month period, or the dissolution of the partnership without immediate reconstitution thereof, and (ii) if Tenant is a closely held corporation (i.e., whose stock is not publicly held and not traded through an exchange or over the counter), (A)

the dissolution, merger, consolidation or other reorganization of Tenant, the sale or other transfer of more than an aggregate of twenty-five percent (25%) of the voting shares of Tenant (other than to immediate family members by reason of gift or death), within a twelve (12)-month period, or (C) the sale, mortgage, hypothecation or pledge of more than an aggregate of twenty-five percent (25%) of the value of the unencumbered assets of Tenant within a twelve (12) month period.

## 15. OWNERSHIP AND REMOVAL OF TRADE FIXTURES.

15.1    Surrender of Premises.  No act or thing done by Landlord or any agent or employee of Landlord during the Lease Term shall be deemed to constitute an acceptance by Landlord of a surrender of the Premises unless such intent is specifically acknowledged in a writing signed by Landlord.  The delivery of keys to the Premises to Landlord or any agent or employee of Landlord shall not constitute a surrender of the Premises or effect a termination of this Lease, whether or not the keys are thereafter retained by Landlord, and notwithstanding such delivery Tenant shall be entitled to the return of such keys at any reasonable time upon request until this Lease shall have been properly terminated.

15.2    Removal of Tenant Property by Tenant.  Upon the expiration of the Lease Term, or upon any earlier termination of this Lease, Tenant shall, subject to the provisions of this Article 15, quit and surrender possession of the Premises to Landlord in as good order and condition as when Tenant took possession and as thereafter improved by Landlord and/or Tenant, reasonable wear and tear excepted.  Upon such expiration or termination, Tenant shall, without expense to Landlord, remove or cause to be removed from the Premises all debris and rubbish, and such items of furniture, equipment, free-standing cabinet work, and other articles of personal property owned by Tenant or installed or placed by Tenant at its expense in the Premises, and such similar articles of any other persons claiming under Tenant, as Landlord may, in its sole discretion, require to be removed, and Tenant shall repair at its own expense all damage to the Premises and Building resulting from such removal.

## 16. HOLDING OVER.  If Tenant holds over after the expiration of the Lease Term hereof, with or without the express or implied consent of Landlord, such tenancy shall be from month-to-month only, and shall not constitute a renewal hereof or an extension for any further term, and in such case Base Rent shall be payable at a monthly rate equal to twice the Base Rent applicable during the last rental period of the Lease Term under this Lease.  Such month-to-month tenancy shall be subject to every other term, covenant and agreement contained herein.  Nothing contained in this Article 16 shall be construed as consent by Landlord to any holding over by Tenant, and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or other termination of this Lease.  The provisions of this Article 16 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law.  If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded upon such failure to surrender, and any lost profits to Landlord resulting therefrom.

## 17. ESTOPPEL CERTIFICATES.  Within ten (10) days following a request in writing by Landlord, Tenant shall execute and deliver to Landlord an estoppel certificate, which, as submitted by Landlord, shall be substantially in the form of **Exhibit E**, attached hereto, (or such other form as may be required by any prospective mortgagee or purchaser of the Building, or any portion thereof), indicating therein any exceptions thereto that may exist at that time, and shall also contain any other information reasonably requested by Landlord or Landlord's mortgagee or prospective mortgagee.  Tenant shall execute and deliver whatever other instruments may be reasonably required for such purposes.  Failure of Tenant to timely execute and deliver such estoppel certificate or other instruments shall constitute an acceptance of the Premises and an acknowledgment by Tenant that statements included in the estoppel certificate are true and correct, without exception.

## 18. SUBORDINATION.  This Lease is subject and subordinate to the lien of any mortgages or trust deeds, now or hereafter in force against the Project and the Building, if any, and to all renewals, extensions, modifications, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security of such mortgages or trust deeds, unless the holders of such mortgages or trust deeds , require in writing that this Lease be superior thereto.  Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any such mortgage, to attorn, without any deductions or set-offs whatsoever, to the purchaser upon any such foreclosure sale, if so requested to do so by such purchaser, and to recognize such purchaser as the lessor under this Lease.  Tenant shall, within five (5) days of request by Landlord, execute such further instruments or assurances as Landlord may reasonably deem necessary to evidence or confirm the subordination or superiority of this Lease to any such mortgages or trust deeds.  Tenant hereby irrevocably authorizes Landlord to execute and deliver in the name of Tenant any such instrument or instruments if Tenant fails to do so, provided that such authorization shall in no way relieve Tenant from the obligation of executing such instruments of subordination or superiority.  Tenant waives the provisions of any current or future statute, rule or law which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

## 19. DEFAULTS; REMEDIES.

19.1    Events of Default.  The occurrence of any of the following shall constitute a default of this Lease by Tenant:

19.1.1    Any failure by Tenant to pay any Rent or any other charge required to be paid under this Lease, or any part thereof, when due;

19.1.2    Any failure by Tenant to respond to Landlord's request under Article 17 or 18 within the time permitted therein for such response; or

19.1.3    Any failure by Tenant to observe or perform any other provision, covenant or condition of this Lease to be observed or performed by Tenant where such failure continues for fifteen (15) days after written notice thereof from Landlord to Tenant; provided however, that any such notice shall be in lieu of, and not in addition to, any notice required under applicable law; and provided further that if the nature of such default is such that the same cannot reasonably be cured within a fifteen (15)-day period, Tenant shall not be deemed to be in default if it diligently commences such cure within such period and thereafter diligently proceeds to rectify and cure said default as soon as possible; or

19.1.4   Abandonment, vacation or surrender of the Premises by Tenant.

19.2   Remedies Upon Default.  Upon the occurrence of any event of default by Tenant, Landlord shall have, in addition to any other remedies available to Landlord at law or in equity, the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and nonexclusive, without any notice or demand whatsoever.

19.2.1   Right of Re-Entry.  Landlord may at once re-enter the Premises or any part of the Premises in the name of the whole and, upon or without such entry, at its option, terminate this Lease and may expel and remove from the Premises Tenant and any Persons claiming under Tenant and its and their effects without being deemed guilty of any trespass or becoming liable for any loss or damage occasioned thereby, without prejudice to any other right or remedy of action, including summary possession, if permitted, which Landlord may have for rent or any other indebtedness owing by Tenant hereunder, whether theretofore or thereafter accruing or to accrue, or damages for any preceding or other breach of contract.

19.2.2   Summary Possession.  Whether or not Landlord shall have taken any action above permitted, Landlord may, if permitted by Law, bring an action for summary possession in case of such default, and in any such action, service of prior notice or demand is hereby expressly waived.  Landlord, at its option, may assert its claim for unpaid rents in such action or may institute a separate action for the recovery of rent.

19.2.3   Removal of Persons and Property.  In the event of such resumption of possession under this Lease, whether by summary proceedings or by any other means, Landlord, or any receiver appointed by a court having jurisdiction, may dispossess and remove all persons and property from the Premises, and any property so removed may be stored in any public warehouse or elsewhere at the cost of and for the account of Tenant, and Landlord shall not be responsible for the care or safekeeping thereof, and Tenant hereby waives any and all loss, destruction, and/or damages or injury which may be occasioned in the exercise of any of the aforesaid acts.

19.2.4   Damages, Attorneys' Fees and Costs.  Landlord may recover from Tenant all damages, attorneys' fees and costs that may have been incurred by Landlord as a result of any default of Tenant hereunder, including the expense of recovering possession.

19.2.5   Election to Terminate Lease.  No re-entry or taking of possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease, unless a written notice that this Lease is terminated is given by Landlord or Tenant, or an order is secured stating that this Lease is terminated.  The effective date of termination of this Lease shall be as of the date set forth or provided in the notice or order aforementioned, as the case may be.

19.2.6   Reletting of Premises.  Landlord may from time to time, without terminating this Lease, relet the Premises or any part thereof for the account of Tenant, for all or any portion of the remainder of the Term to a Tenant or Tenants satisfactory to Landlord, and at such rental or rentals as may, in the exercise of reasonable efforts, be obtained, with the right to Landlord to put the Premises in good order and condition and to make reasonable alterations and repairs to facilitate such reletting at Tenant's expense, and Landlord shall receive such rentals and apply them, first to the payment of the expenses of recovering possession of the Premises and the re-renting thereof, including without limitation, all attorneys' fees and brokers' commission, together with such expenses as Landlord may have incurred in putting the Premises in good order and condition or in making such alterations and repairs, and then to the payment of rent and to the fulfillment of the covenants of Tenant, the balance, if any, to be paid over to Tenant, provided that Tenant shall remain liable for any deficiency, which deficiency Tenant agrees to pay monthly as the same may accrue.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

19.2.7   Damages on Termination.  Should Landlord at any time terminate this Lease for any default, breach or failure of Tenant hereunder, then, in addition to any other rights or remedies available to Landlord hereunder or by Law provided, Landlord may have and recover from Tenant all damages (including Landlord may incur by reason of such default, breach or failure including, without limitation, damages for loss of Percentage Rent determined in accordance with subsection g. above, all costs of recovering the Premises (including without limitation, court costs and reasonable attorneys' fees for services in recovering possession), all costs and expenses of any re-letting, including without limitation, all costs of alterations and repairs, dividing and subdividing of the Premises in connection therewith, all brokerage commissions or other similar expenses of Landlord in connection with such re-letting, or at the option of Landlord, Landlord may have and recover from Tenant, the worth at the time of termination of this Lease, of the excess, if any, of the total Monthly Minimum Rent and Percentage Rent and other charges reserved in this Lease for the remainder of the Term hereof, over the then reasonable rental value of the Premises for the same period, all of which amounts, including attorneys' fees of Landlord, shall be immediately due and payable by Tenant to Landlord.

19.2.8   Performance of Lease Covenants.  Landlord may, but shall not be obligated so to do, without waiving or releasing Tenant from any obligations of Tenant, and in addition to all other remedies provided herein, make any such payment and perform any other act on Tenant's part to be made or performed as provided in this Lease.  All sums so paid by Landlord and all costs incidental thereto (including reasonable attorneys' fees), together with interest thereon at the Rate of Interest, and a fifteen percent (15%) administrative charge, shall be payable by Tenant upon demand, and Tenant hereby covenants to pay any and all such sums.

19.3   Remedies are Cumulative.  Each and all of the remedies given to Landlord hereunder are cumulative and exercise of one right or remedy by Landlord shall not impair Landlord's right to any other remedy.

19.4   Waiver of Redemption.  Tenant waives any right of redemption arising as a result of Landlord's exercise of its remedies under this Article 19.

19.5   No Waiver.  Landlord's failure to assert any default or breach of covenant on the part of Tenant shall not be construed as a waiver thereof, nor shall any custom or practice which may arise between Landlord and Tenant in the course of administering this Lease be construed to waive or to lessen the right of Landlord to insist upon the performance by Tenant of any term, covenant or condition hereof, or to waive or lessen the right of Landlord to exercise any rights given Landlord on account of any such default.  A waiver by Landlord of a particular breach or default shall not be deemed to be a waiver of the same or any other subsequent breach or default.  The acceptance of rent or any other sum due hereunder shall not be, or be construed to be, a waiver of any breach of any term,

covenant or condition of this Lease, whether or not Landlord has knowledge of such breach at the time of such acceptance.

**20.**     **FORCE MAJEURE.**  Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain services, labor, or materials or reasonable substitutes therefor, governmental actions, civil commotions, fire or other casualty, and other causes beyond the reasonable control of the party obligated to perform, except with respect to the obligations imposed with regard to Rent and other charges to be paid by Tenant pursuant to this Lease (collectively, the "**Force Majeure**"), notwithstanding anything to the contrary contained in this Lease, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage and, therefore, if this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure.

**21.**     **SECURITY DEPOSIT.**  Concurrent with Tenant's execution of this Lease, Tenant shall deposit with Landlord a security deposit (the "**Security Deposit**") in the amount set forth in Section 11 of the Summary.  The Security Deposit shall be held by Landlord as security for the faithful performance by Tenant of all the terms, covenants, and conditions of this Lease to be kept and performed by Tenant during the Lease Term.  If Tenant defaults with respect to any provisions of this Lease, including, but not limited to, the provisions relating to the payment of Rent, Landlord may, but shall not be required to, use, apply or retain all or any part of the Security Deposit for the payment of any Rent or any other sum in default, or for the payment of any amount that Landlord may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage that Landlord may suffer by reason of Tenant's default.  If any portion of the Security Deposit is so used or applied, Tenant shall, within five (5) days after written demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount, and Tenant's failure to do so shall be a default under this Lease.  If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, the Security Deposit, or any balance thereof, shall be returned to Tenant, or, at Landlord's option, to the last assignee of Tenant's interest hereunder, within sixty (60) days following the expiration of the Lease Term.  Tenant shall not be entitled to any interest on the Security Deposit.

**22.**     **SUBSTITUTION OF OTHER PREMISES.**  Landlord shall have the right, on thirty (30) days' prior notice, to relocate Tenant to another space in the Building comparable to the Premises, and all terms hereof shall apply to the new space with equal force.  In such event, Landlord shall give Tenant prior notice of Landlord's election to so relocate Tenant, and shall move Tenant's effects to the new space at Landlord's sole cost and expense at such time and in such manner as to inconvenience Tenant as little as reasonably practicable.  Simultaneously with such relocation of the Premises, the parties shall immediately execute an amendment to this Lease stating the relocation of the Premises.  Should Tenant refuse to permit Landlord to move Tenant to such new space, Landlord shall have the right to cancel and terminate this Lease effective sixty (60) days from the date of Landlord's election to relocate Tenant.

**23.**     **SIGNS.**

        23.1     In General.  Tenant shall be entitled, at its sole cost and expense, to identification signage outside of Tenant's Premises on the floor on which Tenant's Premises are located.  The location, quality, design, style, lighting and size of such signage shall be consistent with the Landlord's Building standard signage program and shall be subject to Landlord's prior written approval, in its sole discretion.  Upon the expiration or earlier termination of this Lease, Tenant shall be responsible, at its sole cost and expense, for the removal of such signage and the repair of all damage to the Building caused by such removal.

        23.2     Prohibited Signage and Other Items.  Any signs, notices, logos, pictures, names or advertisements which are installed and that have not been individually approved by Landlord may be removed without notice by Landlord at the sole expense of Tenant.  Tenant may not install any signs on the exterior or roof of the Building or the common areas of the Building or the Building.  Any signs, window coverings, or blinds (even if the same are located behind the Landlord approved window coverings for the Building), or other items visible from the exterior of the Premises or Building are subject to the prior approval of Landlord, in its sole discretion.

**24.**     **COMPLIANCE WITH LAW.**  Tenant shall not do anything or suffer anything to be done in or about the Premises which will in any way conflict with any law, statute, ordinance or other governmental rule, regulation or requirement now in force or which may hereafter be enacted or promulgated.  At its sole cost and expense, Tenant shall promptly comply with all such governmental measures, other than the making of structural changes or changes to the Building's life safety system.  Should any standard or regulation now or hereafter be imposed on Landlord or Tenant by a state, federal or local governmental body charged with the establishment, regulation and enforcement of occupational, health or safety standards for employers, employees, landlords or tenants, then Tenant agrees, at its sole cost and expense, to comply promptly with such standards or regulations.  The judgment of any court of competent jurisdiction or the admission of Tenant in any judicial action, regardless of whether Landlord is a party thereto, that Tenant has violated any of said governmental measures, shall be conclusive of that fact as between Landlord and Tenant.

**25.**     **LATE CHARGES.**  If any installment of Rent or any other sum due from Tenant shall not be received by Landlord or Landlord's designee within five (5) days after said amount is due, or if any check delivered to Landlord by Tenant shall be returned for insufficient funds, then Tenant shall pay to Landlord a late charge equal to ten percent (10%) of the amount due.  In addition to the late charge, in the event any check is returned for insufficient funds, Tenant shall pay to Landlord, as additional rent, the sum of $25.00.  The late charge shall be deemed Additional Rent and the right to require it shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.  In addition to the late charge described above, any Rent or other amounts owing hereunder which are not paid when due shall thereafter bear interest until paid at a rate equal to ten percent (10%) per annum, provided that in no case shall such rate be higher than  the highest rate permitted by applicable law.  In the event that more than one (1) check of Tenant is returned for insufficient funds in any twelve (12) month period, Landlord shall have the right to require that any or all subsequent payments by Tenant to Landlord be in the form of cash, money order, cashier's or certified check drawn on an institution acceptable to Landlord, notwithstanding any prior practice of accepting payments in any different form.

**26.**     **LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT.**  All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of Rent.  If Tenant shall fail to perform any of its obligations under this Lease, within a reasonable time after such performance is required by the terms of this Lease, Landlord may, but shall not be obligated to, after reasonable prior notice to Tenant, make any such payment or perform any such act on Tenant's part without waiving its right based upon any default of Tenant and without releasing Tenant from any obligations hereunder.  Except as may be specifically provided to the contrary in this Lease, Tenant shall pay to Landlord, within fifteen (15) days after delivery by Landlord to Tenant of statements therefor:  (i) sums equal to expenditures reasonably made and obligations incurred by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the foregoing provisions of this Article 26; (ii) sums equal to all losses, costs, liabilities, damages and expenses referred to in Article 10 of this Lease; and (iii) sums equal to all expenditures made and obligations incurred by Landlord in collecting or attempting to collect the Rent or in enforcing or attempting to enforce any rights of Landlord under this Lease or pursuant to law, including, without limitation, all legal fees and other amounts so expended.  Tenant's obligations under this Article 26 shall survive the expiration or sooner termination of the Lease Term.

**27.**     **ENTRY BY LANDLORD.**  Landlord reserves the right at all reasonable times and upon reasonable notice to the Tenant to enter the Premises to (i) inspect them; (ii) show the Premises to prospective purchasers, mortgagees or tenants; (iii) post notices of nonresponsibility; or (iv) alter, improve or repair the Premises or the Building if necessary to comply with current building codes or other applicable laws, or for structural alterations, repairs or improvements to the Building.  Notwithstanding anything to the contrary contained in this Article 27, Landlord may enter the Premises at any time to (A) perform services required of Landlord; (B) take possession due to any breach of this Lease in the manner provided herein; and (C) perform any covenants of Tenant, which Tenant fails to perform.  Any such entries shall be without the abatement of Rent and shall include the right to take such reasonable steps as required to accomplish the stated purposes.  Tenant hereby waives any claims for damages or for any injuries or inconvenience to or interference with Tenant's business, lost profits, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned thereby.  For each of the above purposes, Landlord shall at all times have a key with which to unlock all the doors in the Premises.  In an emergency, Landlord shall have the right to use any means that Landlord may deem proper to open the doors in and to the Premises.  Any entry into the Premises in the manner hereinbefore described shall not be deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an actual or constructive eviction of Tenant from any portion of the Premises.

**28.**     **TENANT PARKING.**  Tenant shall rent parking passes on a monthly basis throughout the Lease Term in the amount set forth in Section 12 of the Summary to park in the Building Parking Facility.  Tenant shall pay to Landlord for automobile parking passes on a monthly basis the prevailing rate charged for parking passes at the location of such passes.  Tenant's continued right to use the parking passes is conditioned upon Tenant abiding by all rules and regulations which are prescribed from time to time for the orderly operation and use of the Building Parking Facility and upon Tenant's cooperation in seeing that Tenant's employees and visitors also comply with such rules and regulations.  Landlord specifically reserves the right to change the size, configuration, design, layout, location and all other aspects of the Building Parking Facility and Tenant acknowledges and agrees that Landlord may, without incurring any liability to Tenant and without any abatement of Rent under this Lease, from time to time, close-off or restrict access to the Building Parking Facility, or relocate Tenant's parking passes to other parking structures and/or surface parking areas within a reasonable distance of the Premises, for purposes of permitting or facilitating any such construction, alteration or improvements with respect to the Building Parking Facility or to accommodate or facilitate renovation, alteration, construction or other modification of other improvements or structures located in the Project.  Landlord may delegate its responsibilities hereunder to a parking operator in which case such parking operator shall have all the rights of control attributed hereby to the Landlord and such owner.  The parking rates charged by Landlord for Tenant's parking passes shall be exclusive of any parking tax or other charges imposed by governmental authorities in connection with the use of such parking, which taxes and/or charges shall be paid directly by Tenant or the parking users, or, if directly imposed against Landlord, Tenant shall reimburse Landlord for all such taxes and/or charges concurrent with its payment of the parking rates described herein.

**29.**     **MISCELLANEOUS PROVISIONS.**

        29.1     Binding Effect.  Each of the provisions of this Lease shall extend to and shall, as the case may require, bind or inure to the benefit not only of Landlord and of Tenant, but also of their respective successors or assigns, provided this clause shall not permit any assignment by Tenant contrary to the provisions of Article 14 of this Lease.

        29.2     No Air Rights.  No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by this Lease.  If at any time any windows of the Premises are temporarily darkened or the light or view therefrom is obstructed by reason of any repairs, improvements, maintenance or cleaning in or about the Building, the same shall be without liability to Landlord and without any reduction or diminution of Tenant's obligations under this Lease.

        29.3     Modification of Lease.  Should any current or prospective mortgagee for the Building require a modification or modifications of this Lease, which modification or modifications will not cause an increased cost or expense to Tenant or in any other way materially and adversely change the rights and obligations of Tenant hereunder, then and in such event, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are required therefor and deliver the same to Landlord within ten (10) days following the request therefor.  Should Landlord or any such current or prospective mortgagee require execution of a short form of Lease for recording, containing, among other customary provisions, the names of the parties, a description of the Premises and the Lease Term, Tenant agrees to execute such short form of Lease and to deliver the same to Landlord within ten (10) days following the request therefor for filing in the Office of the Assistant Registrar of the Land Court of Hawaii.

        29.4     Transfer of Landlord's Interest.  Tenant acknowledges that Landlord has the right to transfer all or any portion of its interest in the Building and in this Lease, and Tenant agrees that in the event of any such transfer, Landlord shall automatically be released from all liability under this Lease and Tenant agrees to look solely to such transferee for the performance of Landlord's obligations hereunder after the date of transfer.  The liability of any transferee of Landlord shall be limited to the interest of such transferee in the Building and such transferee shall be without personal liability under this Lease, and Tenant hereby expressly waives and releases such personal liability on behalf of itself and all persons claiming by, through or under Tenant.  Tenant further acknowledges that Landlord may assign its interest in this Lease to a mortgage lender as additional security and agrees that such an assignment

shall not release Landlord from its obligations hereunder and that Tenant shall continue to look to Landlord for the performance of its obligations hereunder.

29.5    Prohibition Against Recording. Except as provided in Section 29.3 of this Lease, neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant, and the recording thereof in violation of this provision shall make this Lease null and void at Landlord's election.

29.6    Relationship of Parties. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant, it being expressly understood and agreed that neither the method of computation of Rent nor any act of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

29.7    Application of Payments. Landlord shall have the right to apply payments received from Tenant pursuant to this Lease, regardless of Tenant's designation of such payments, to satisfy any obligations of Tenant hereunder, in such order and amounts as Landlord, in its sole discretion, may elect.

29.8    Time of Essence. Time is of the essence of this Lease and each of its provisions.

29.9    Partial Invalidity. If any term, provision or condition contained in this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, provision or condition to persons or circumstances other than those with respect to which it is invalid or unenforceable, shall not be affected thereby, and each and every other term, provision and condition of this Lease shall be valid and enforceable to the fullest extent possible permitted by law.

29.10    No Warranty. In executing and delivering this Lease, Tenant has not relied on any representation, including, but not limited to, any representation whatsoever as to the amount of any item comprising Additional Rent or the amount of the Additional Rent in the aggregate or that Landlord is furnishing the same services to other tenants, at all, on the same level or on the same basis, or any warranty or any statement of Landlord which is not set forth herein or in one or more of the exhibits attached hereto.

29.11    Entire Agreement. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting this Lease and this Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease.

29.12    Right to Lease. Landlord reserves the absolute right to effect such other tenancies in the Building as Landlord in the exercise of its sole business judgment shall determine to best promote the interests of the Building. Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or type or number of tenants shall, during the Lease Term, occupy any space in the Building.

29.13    Waiver of Redemption by Tenant. Tenant hereby waives for Tenant and for all those claiming under Tenant all right now or hereafter existing to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Premises after any termination of this Lease.

29.14    Notices. All notices, demands, statements or communications (collectively, "Notices") given or required to be given by either party to the other hereunder shall be in writing, shall be sent by United States certified or registered mail, postage prepaid, return receipt requested, delivered by a nationally recognized overnight courier, or delivered personally (i) to Tenant at the appropriate address set forth in Section 5 of the Summary, or to such other place as Tenant may from time to time designate in a Notice to Landlord; or (ii) to Landlord at the addresses set forth in Section 3 of the Summary, or to such other firm or to such other place as Landlord may from time to time designate in a Notice to Tenant. Any Notice will be deemed given on the date it is mailed as provided in this Section 29.14, the date the overnight courier delivery is made, or upon the date personal delivery is made. If Tenant is notified of the identity and address of Landlord's mortgagee, Tenant shall give to such mortgagee written notice of any default by Landlord under the terms of this Lease by registered or certified mail, and such mortgagee shall be given a reasonable opportunity to cure such default prior to Tenant's exercising any remedy available to Tenant.

29.15    Landlord Exculpation. It is expressly understood and agreed that notwithstanding anything in this Lease to the contrary, and notwithstanding any applicable law to the contrary, the liability of Landlord and the Landlord Parties hereunder (including any successor landlord) and any recourse by Tenant against Landlord or the Landlord Parties shall be limited solely and exclusively to an amount which is equal to the interest of Landlord in the Building, and neither Landlord, nor any of the Landlord Parties shall have any personal liability therefor, and Tenant hereby expressly waives and releases such personal liability on behalf of itself and all persons claiming by, through or under Tenant. Notwithstanding any contrary provision herein, neither Landlord nor the Landlord Parties shall be liable under any circumstances for injury or damage to, or interference with, Tenant's business, including but not limited to, loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill or loss of use, in each case, however occurring.

29.16    Joint and Several. If there is more than one Tenant, the obligations imposed upon Tenant under this Lease shall be joint and several.

29.17    Authority. If Tenant is a corporation or partnership, each individual executing this Lease on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in the state in which the Building is located and that Tenant has full right and authority to execute and deliver this Lease and that each person signing on behalf of Tenant is authorized to do so.

29.18    Attorneys' Fees. If either party commences litigation against the other for the specific performance of this Lease, for damages for the breach hereof or otherwise for enforcement of any remedy hereunder, the parties hereto agree to and hereby do waive any right to a trial by jury and, in the event of any such commencement of litigation, the prevailing party shall be entitled to recover from the other party such costs and reasonable attorneys' fees as may have been incurred, including any and all costs incurred in enforcing, perfecting and executing such judgment.

29.19    Governing Law. This Lease shall be construed and enforced in accordance with the laws of the State of Hawaii.

U.S. Bankruptcy Court - Hawaii  #23-00386  Dkt # 50  Filed  06/29/23  Page 22 of 33

29.20    Submission of Lease. Submission of this instrument for examination or signature by Tenant does not constitute a reservation of or an option for lease, and it is not effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.

29.21    Brokers. Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Lease, excepting only the real estate brokers or agents specified in Section 13 of the Summary (the "Brokers"). Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, and costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of the indemnifying party's dealings with any real estate broker or agent, other than the Brokers.

29.22    Independent Covenants. This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and Tenant hereby expressly waives the benefit of any statute to the contrary and agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any setoff of the Rent or other amounts owing hereunder against Landlord.

29.23    Building Name and Signage. Landlord shall have the right at any time to change the name of the Building and to install, affix and maintain any and all signs on the exterior and on the interior of the Building as Landlord may, in Landlord's sole discretion, desire. Tenant shall not use the name of the Building or use pictures or illustrations of the Building in advertising or other publicity, without the prior written consent of Landlord.

29.24    Transportation Management. Tenant shall fully comply with all present or future programs intended to manage parking, transportation or traffic in and around the Building, and in connection therewith, Tenant shall take responsible action for the transportation planning and management of all employees located at the Premises by working directly with Landlord, any governmental transportation management organization or any other transportation-related committees or entities.

29.25    Hazardous Material. As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material or waste which is or becomes regulated by any local governmental authority, the state in which the Building is located or the United States Government. Tenant acknowledges that Landlord may incur costs (A) for complying with laws, codes, regulations or ordinances relating to Hazardous Material, or (B) otherwise in connection with Hazardous Material. Tenant agrees that the costs incurred by Landlord with respect to, or in connection with, complying with laws, codes, regulations or ordinances relating to Hazardous Material shall be an Operating Expense, unless the cost of such compliance, as between Landlord and Tenant, is made the responsibility of Tenant under this Lease.

29.26    Confidentiality. Tenant acknowledges that the content of this Lease and any related documents are confidential information. Tenant shall keep such confidential information strictly confidential and shall not disclose such confidential information to any person or entity other than Tenant's financial, legal, and space planning consultants.

29.27    Landlord Renovations. It is specifically understood and agreed that Landlord has no obligation and has made no promises to alter, remodel, improve, renovate, repair or decorate the Premises, Building, or any part thereof and that no representations respecting the condition of the Premises or the Building have been made by Landlord to Tenant except as specifically set forth herein or in the Tenant Work Letter. However, Tenant acknowledges that Landlord is currently renovating or may during the Lease Term renovate, improve, alter, or modify (collectively, the "Renovations") the Building, Premises, and/or Project, including without limitation the Building Parking Facility, common areas, systems and equipment, roof, and structural portions of the same. In connection with such Renovations, Landlord may, among other things, erect scaffolding or other necessary structures in the Building, limit or eliminate access to portions of the Project, including portions of the common areas, or perform work in the Building, which work may create noise, dust or leave debris in the Building. Tenant hereby agrees that such Renovations and Landlord's actions in connection with such Renovations shall in no way constitute a constructive eviction of Tenant nor entitle Tenant to any abatement of Rent. Landlord shall have no responsibility or for any reason be liable to Tenant for any direct or indirect injury to or interference with Tenant's business arising from the Renovations, nor shall Tenant be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from the Renovations or Landlord's actions in connection with such Renovations, or for any inconvenience or annoyance occasioned by such Renovations or Landlord's actions in connection with such Renovations.

29.28    Asbestos Disclosures. Tenant specifically acknowledges that Tenant has been advised that asbestos-containing materials ("ACM") were used in the initial construction of the Building, and may have been used in connection with various additions and improvements made thereafter from time to time. In addition, the Hawaii Occupational Safety and Health Administration designates the following materials as "presumed asbestos containing material" ("PACM"), unless such presumption is affirmatively rebutted: (i) thermal system insulation and surfacing material found in buildings constructed no later than 1980; (ii) sprayed on and troweled-on surfacing materials in buildings constructed no later than 1980; and (iii) asphalt and vinyl flooring material installed no later than 1980.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed the day and date first above written.

"Landlord":

FPA Kapiolani Associates LLC,
A Delaware limited liability company

By Agent: Trinity Property Consultants, LLC
A California limited liability company

By: _____
          Mr. James Estrada
     Its: _____

"Tenant":
Pancakes of Hawaii, Inc., a Hawaii corporation

By: _____
          Name: Young Acopan

     Its: _____



## EXHIBIT B

### 1221 KAPIOLANI BOULEVARD

### TENANT WORK LETTER

Tenant to accept the premises in "AS IS" condition.   Any required improvement shall be at the Tenant's sole cost and expense and subject to Landlord's prior approval.

**EXHIBIT C**

**1221 KAPIOLANI BOULEVARD**

**NOTICE OF LEASE TERM DATES**

To:     Pancakes of Hawaii, Inc., a Hawaii Corporation
        Ms. Young Acopan
        1414 Dillingham Blvd.
        Honolulu, HI 96817

Re:     Retail Lease dated June _____, 2005, between FPA Kapiolani Associates LLC, a Delaware limited liability company("Landlord"), and Yamauchi Chiropractic Inc., a Hawaii Corporation ("Tenant") concerning Suite 104 on the ground floor of the Office/Retail Building located at 1221 Kapiolani Boulevard, Honolulu, Hawaii 96814

Gentlemen:

In accordance with the Office Lease (the "Lease"), we wish to advise you and/or confirm as follows:

1.      That the Premises are Ready for Occupancy, and that the Lease Term shall commence as of July 1, 2005 for a term of three (3) years and zero (0) months ending on June 30, 2008.

2.      That in accordance with the Lease, Rent commenced to accrue on July 1, 2005.

3.      If the Lease Commencement Date is other than the first day of the month, the first billing will contain a pro rata adjustment. Each billing thereafter, with the exception of the final billing, shall be for the full amount of the monthly installment as provided for in the Lease.

4.      Rent is due and payable in advance on the first day of each and every month during the Lease Term. Your rent checks should be made payable to FPA Kapiolani Associates, LLC. c/o Trinity Property Consultants, P.O. Box 1410, Suisan City, CA, 94585-4410.

5.      The exact number of rentable square feet within the Premises is 2,295 rentable square feet.

6.      Tenant's Share as adjusted based upon the exact number of rentable square feet within the Premises is 1.72%.

                              "Landlord": FPA Kapiolani Associates LLC,
                              A Delaware limited liability company

                              By Agent: Trinity Property Consultants, LLC
                              A California limited liability company

                              By:_____
                                   Mr. James Estrada

                              Its:_____

Agreed to and Accepted as of _____, 2005.

"Tenant":

Pancakes of Hawaii, Inc., a Hawaii Corporation

By:_____

Name: Ms. Young Acopan

Its:

## 1221 KAPIOLANI BOULEVARD

## RULES AND REGULATIONS

Tenant shall faithfully observe and comply with the following Rules and Regulations. Landlord shall not be responsible to Tenant for the nonperformance of any of said Rules and Regulations by or otherwise with respect to the acts or omissions of any other tenants or occupants of the Building.

1.    Tenant shall not alter any lock or install any new or additional locks or bolts on any doors or windows of the Premises without obtaining Landlord's prior written consent. Tenant shall bear the cost of any lock changes or repairs required by Tenant. Two keys will be furnished by Landlord for the Premises, and any additional keys required by Tenant must be obtained from Landlord at a reasonable cost to be established by Landlord.

2.    All doors opening to public corridors shall be kept closed at all times except for normal ingress and egress to the Premises, unless electrical hold backs have been installed.

3.    Landlord reserves the right to close and keep locked all entrance and exit doors of the Building during such hours as are customary for comparable buildings in the vicinity of the Building. Tenant, its employees and agents must be sure that the doors to the Building are securely closed and locked when leaving the Premises if it is after the normal hours of business for the Building. Any tenant, its employees, agents or any other persons entering or leaving the Building at any time when it is so locked, or any time when it is considered to be after normal business hours for the Building, may be required to sign the Building register when so doing. Access to the Building may be refused unless the person seeking access has proper identification or has a previously arranged pass for access to the Building. The Landlord and his agents shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. In case of invasion, mob, riot, public excitement, or other commotion, Landlord reserves the right to prevent access to the Building during the continuance of same by any means it deems appropriate for the safety and protection of life and property.

4.    Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy property brought into the Building. Safes and other heavy objects shall, if considered necessary by Landlord, stand on supports of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property in any case. All damage done to any part of the Building, its contents, occupants or visitors by moving or maintaining any such safe or other property shall be the sole responsibility of Tenant and any expense of said damage or injury shall be borne by Tenant.

5.    No furniture, freight, packages, supplies, equipment or merchandise will be brought into or removed from the Building or carried up or down in the elevators, except upon prior notice to Landlord, and in such manner, in such specific elevator, and between such hours as shall be designated by Landlord. Tenant shall provide Landlord with not less than 24 hours prior notice of the need to utilize an elevator for any such purpose, so as to provide Landlord with a reasonable period to schedule such use and to install such padding or take such other actions or prescribe such procedures as are appropriate to protect against damage to the elevators or other parts of the Building.

6.    Landlord shall have the right to control and operate the public portions of the Building, the public facilities, the heating and air conditioning, and any other facilities furnished for the common use of tenants, in such manner as is customary for comparable buildings in the vicinity of the Building.

7.    The requirements of Tenant will be attended to only upon application at the Office of the Building or at such office location designated by Landlord. Employees of Landlord shall not perform any work or do anything outside their regular duties unless under special instructions from Landlord.

8.    Tenant shall not disturb, solicit, or canvass any occupant of the Building and shall cooperate with Landlord or Landlord's agents to prevent same.

9.    The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees or agents, shall have caused it.

10.    Tenant shall not overload the floor of the Premises, nor mark, drive nails or screws, or drill into the partitions, woodwork or plaster or in any way deface the Premises or any part thereof without Landlord's consent first had and obtained.

11.    Except for vending machines intended for the sole use of Tenant's employees and invitees, no vending machine or machines of any description other than fractional horsepower office machines shall be installed, maintained or operated upon the Premises without the written consent of Landlord.

12.    Tenant shall not use or keep in or on the Premises or the Building any kerosene, gasoline or other inflammable or combustible fluid or material.

13.    Tenant shall not use any method of heating or air conditioning other than that which may be supplied by Landlord, without the prior written consent of Landlord.

14.    Tenant shall not use, keep or permit to be used or kept, any foul or noxious gas or substance in or on the Premises, or permit or allow the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors, or vibrations, or interfere in any way with other Tenants or those having business therein.

15.    Tenant shall not bring into or keep within the Building or the Premises any animals, birds, bicycles or other vehicles.

16.    No cooking shall be done or permitted by any tenant on the Premises, nor shall the Premises be used for the storage of merchandise, for lodging or for any improper, objectionable or immoral purposes. Notwithstanding the foregoing, Underwriters' laboratory-approved equipment and microwave ovens may be used in the Premises for heating food and brewing coffee, tea, hot chocolate and similar beverages, provided that such use is in accordance with all applicable federal, state and city laws, codes, ordinances, rules and regulations, and does not cause odors which are objectionable to Landlord and other Tenants.

17.     Landlord will approve where and how telephone and telegraph wires are to be introduced to the Premises. No boring or cutting for wires shall be allowed without the consent of Landlord. The location of telephone, call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord.

18.     Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of these Rules and Regulations.

19.     Tenant, its employees and agents shall not loiter in the entrances or corridors, nor in any way obstruct the sidewalks, lobby, halls, stairways or elevators, and shall use the same only as a means of ingress and egress for the Premises.

20.     Tenant shall not waste electricity, water or air conditioning and agrees to cooperate fully with Landlord to ensure the most effective operation of the Building's air conditioning system, and shall refrain from attempting to adjust any controls. This includes the closing of exterior blinds, disallowing the sun-rays to shine directly into areas adjacent to exterior windows.

21.     Tenant shall store all its trash and garbage within the interior of the Premises. No material shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash and garbage in the city in which the Building is located without violation of any law or ordinance governing such disposal. All trash, garbage and refuse disposal shall be made only through entry-ways and elevators provided for such purposes at such times as Landlord shall designate.

22.     Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

23.     Tenant shall assume any and all responsibility for protecting the Premises from theft, robbery and pilferage, which includes keeping doors locked and other means of entry to the Premises closed, when the Premises are not occupied.

24.     Landlord may waive any one or more of these Rules and Regulations for the benefit of any particular tenant or tenants, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant or tenants, nor prevent Landlord from thereafter enforcing any such Rules or Regulations against any or all tenants of the Building.

25.     No awnings or other projection shall be attached to the outside walls of the Building without the prior written consent of Landlord. No curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises without the prior written consent of Landlord. All electrical ceiling fixtures hung in offices or spaces along the perimeter of the Building must be fluorescent and/or of a quality, type, design and bulb color approved by Landlord.

26.     The sashes, sash doors, skylights, windows, and doors that reflect or admit light and air into the halls, passageways or other public places in the Building shall not be covered or obstructed by Tenant, nor shall any bottles, parcels or other articles be placed on the windowsills.

27.     The washing and/or detailing of or, the installation of windshields, radios, telephones in or general work on, automobiles shall not be allowed on the Building.

28.     Food vendors shall be allowed in the Building upon receipt of a written request from the Tenant. The food vendor shall service only the tenants that have a written request on file in the Building Management Office. Under no circumstance shall the food vendor display their products in a public or common area including corridors and elevator lobbies. Any failure to comply with this rule shall result in immediate permanent withdrawal of the vendor from the Building.

29.     Tenant must comply with requests by the Landlord concerning the informing of their employees of items of importance to the Landlord.

30.     Tenant shall comply with any non-smoking ordinance adopted by any applicable governmental authority.

31.     Landlord reserves the right at any time to change or rescind any one or more of these Rules and Regulations, or to make such other and further reasonable Rules and Regulations as in Landlord's judgment may from time to time be necessary for the management, safety, care and cleanliness of the Premises and Building, and for the preservation of good order therein, as well as for the convenience of other occupants and tenants therein. Landlord shall not be responsible to Tenant or to any other person for the nonobservance of the Rules and Regulations by another tenant or other person. Tenant shall be deemed to have read these Rules and Regulations and to have agreed to abide by them as a condition of its occupancy of the Premises.

**EXHIBIT E**

**1221 KAPIOLANI BOULEVARD**

**FORM OF TENANT'S ESTOPPEL CERTIFICATE**

The undersigned as Tenant under that certain Office/Industrial Lease (the "Lease") made and entered into as of _____, 2005 and between FPA Kapiolani Associates LLC, a Delaware limited liability company as Landlord, and the undersigned as Tenant, for Premises on the _____ floor(s) of the Office/Retail Building located at

**1221 Kapiolani Boulevard, Honolulu, Hi  96814** certifies as follows:

1.       Attached hereto as Exhibit A is a true and correct copy of the Lease and all amendments and modifications thereto.  The documents contained in Exhibit A represent the entire agreement between the parties as to the Premises.

2.       The undersigned has commenced occupancy of the Premises described in the Lease, currently occupies the Premises, and the Lease Term commenced on _____.

3.       The Lease is in full force and effect and has not been modified, supplemented or amended in any way except as provided in Exhibit A.

4.       Tenant has not transferred, assigned, or sublet any portion of the Premises nor entered into any license or concession agreements with respect thereto except as follows:

5.       Tenant shall not modify the documents contained in Exhibit A or prepay any amounts owing under the Lease to Landlord in excess of thirty (30) days without the prior written consent of Landlord's mortgagee.

6.       Base Rent became payable on _____.

7.       The Lease Term expires on _____.

8.       All conditions of the Lease to be performed by Landlord necessary to the enforceability of the Lease have been satisfied and Landlord is not in default thereunder.

9.       No rental has been paid in advance and no security has been deposited with Landlord except as provided in the Lease.

10.      As of the date hereof, there are no existing defenses or offsets that the undersigned has, which preclude enforcement of the Lease by Landlord.

11.      All monthly installments of Base Rent, all Additional Rent and all monthly installments of estimated Additional Rent have been paid when due through _____.  The current monthly installment of Base Rent is $_____.

12.      The undersigned acknowledges that this Estoppel certificate may be delivered to Landlord's prospective mortgagee, or a prospective purchaser, and acknowledges that it recognizes that if same is done, said mortgagee, prospective mortgagee, or prospective purchaser will be relying upon the statements contained herein in making the loan or acquiring the property of which the Premises are a part, and in accepting an assignment of the Lease as collateral security, and that receipt by it of this certificate is a condition of making of the loan or acquisition of such property.

13.      If Tenant is a corporation or partnership, each individual executing this Estoppel Certificate on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in the state in which the Building is located and that Tenant has full right and authority to execute and deliver this Estoppel Certificate and that each person signing on behalf of Tenant is authorized to do so.

Executed at _____ on the _____ day of _____, 20___.

"Tenant":

Pancakes of Hawaii, Inc., a Hawaii Corporation

By:_____

Name:

Its:

"Landlord") and Pancakes of Hawaii, Inc., a Hawaii corporation (the "Tenant").

**FIRST CIRCUIT**
**1DRC-22-0005523**
**01-SEP-2022**
**03:23 PM**
**Dkt. 9 EXH**

## RECITALS

WHEREAS, the Landlord, FPA Kapiolani Associates, a Delaware limited liability company, and Pancakes of Hawaii, Inc., a Hawaii corporation, (the Tenant) to that certain written lease (the "Lease") dated June 1st, 2005, concerning the premises at 1221 Kapiolani Boulevard, Suite 104, Honolulu, HI 96814, consisting of 2,295 rentable square feet (the "Premises"); and

WHEREAS, the parties now wish to amend the Lease as of the date first herein above stated.

## AMENDMENTS

NOW, THEREFORE, for valuable consideration given, Landlord and Tenant agree to amend the Lease as follows:

1. Term: One hundred twenty (120) months commencing on December 1st, 2008 and terminating on November 30th, 2018.

2. Base Rent: Commencing on November 1st, 2008, the base rent schedule will be as follows:

| Lease Years | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| 1 -2 | $55,080.00 | $4,590.00 |

For Lease Years Three (3) through Ten (10) on each subsequent anniversary of the Lease Commencement Date the Base Rent amount shall increase by the greater of (i) three percent (3%) or (ii) the amount of any increase in Consumer Price Index for Urban Consumers, Pacific Cities-West A- All Items. The amount of Base Rent shall be increased in the same proportion that such Consumer Price Index increased.

3. Tenant Improvements: Landlord shall contribute a maximum of $15.00 per rentable square foot ($34,425.00) to be used for the aesthetic beautification, repair, and modification of the premises, to be used by September 30th, 2009. Tenant improvement allowance shall not be used for the following: furniture, kitchen equipment, and any and all systems servicing the premises such as kitchen ventilation, plumbing, electrical, and HVAC. Landlord shall also contribute a maximum of $10,000 towards the installation of a new grease trap in the premises, to be completed by December 31st, 2010. Tenant shall submit any and all contractor invoices prior to reimbursement for approval by Landlord. All improvements shall be subject to landlord approval prior to commencement of work. Any additional required improvements shall be at Tenant's sole cost and expense.

4. Tenant shall allow and give full access for Landlord to complete lobby beautification work, including installation of new quartzite tile along lower portion of exterior lobby walls and tinting of exterior lobby windows, estimated to cost $19,630.00. Such work will be at Landlord's sole cost and expense.

Except as modified herein, all of the terms, conditions and covenants of the existing Lease and any previous amendments thereto shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the date first hereinabove stated.

LANDLORD

FPA Kapiolani Associates LLC
a Delaware limited liability company

By its Manager: GF Kapiolani LLC
a Delaware limited liability company

TENANT

Pancakes of Hawaii, Inc.
a Hawaii corporation

By: _____

Name Printed: YAUNG AROUN

**SECOND AMENDMENT TO**
**OFFICE LEASE**

This Second Amendment to Office Lease (the Second Amendment) is made as of December 18, 2018 by and between FPA Kapiolani Associates, a Delaware limited liability company (the "Landlord") and Pancakes of Hawaii, Inc., a Hawaii corporation (the "Tenant").

RECITALS

WHEREAS, the Landlord, FPA Kapiolani Associates, a Delaware limited liability company and Pancakes of Hawaii, Inc., a Hawaii corporation, (the Tenant) to that certain written lease (the "Lease") dated June 1st, 2005, and amended by the First Amendment to Lease dated September 18, 2008, concerning the premises at 1221 Kapiolani Boulevard, Suite 104, Honolulu, HI 96814, consisting of 2,295 rentable square feet (the "Premises"); and

WHEREAS, the parties now wish to amend the Lease as of the date first herein above stated.

AMENDMENTS

NOW, THEREFORE, for valuable consideration given, Landlord and Tenant agree to amend the Lease as follows:

1. Term: One hundred twenty-seven (127) months commencing on December 1st, 2018 and terminating on June 30, 2029.

2. Base Rent: Commencing on December 1, 2018, the base rent schedule will be as follows:

| Months | Monthly Base Rent |
|---|---|
| *December 1, 2018 – April 30, 2019 | $0.00 |
| May 1, 2019 – November 30, 2019 | $5,737.50 |
| December 1, 2019 – August 31, 2020 | $5,909.63 |
| September 1, 2020 – November 30, 2020 | $0.00 |
| December 1, 2020 – November 30, 2021 | $6,086.53 |
| December 1, 2021 – November 30, 2022 | $6,269.13 |
| December 1, 2022 – November 30, 2023 | $6,457.20 |
| December 1, 2023 – November 30, 2024 | $6,650.91 |
| December 1, 2024 – November 30, 2025 | $6,850.44 |
| December 1, 2025 – November 30, 2026 | $7,055.95 |
| December 1, 2026 – November 30, 2027 | $7,267.63 |
| December 1, 2027 – November 30, 2028 | $7,485.66 |
| December 1, 2028 – June 30, 2029 | $7,710.23 |

*Free Rent: Landlord has agreed that Tenant's Base Rent shall be abated from December 1, 2018 through April 30, 2019 and September 1, 2020 – November 30, 2020 in the total amount of $46,416.39. Upon any event of default under this Lease (that remains uncured after any applicable grace or cure period), any free rent shall be immediately due and payable to Landlord.

3. Operating Expense/CAM Charges: Commencing on December 1, 2018, in addition to the Monthly Base Rent as shown above. Tenant shall pay its pro rata share of the building's Operating Expenses and Common Area Maintenance ("C.A.M.") charges, which are currently estimated for 2019 at approximately $1.54 per RSF per month, and subject to annual adjustments as provided for in the Lease document.

4. General Excise Tax: Landlord will add applicable General Excise Taxes on all amounts due under the terms of the Lease. The current General Excise Tax rate is 4.712%.

5. Security Deposit: Landlord will continue to hold $3,716.65 as a Security Deposit.

6. Tenant Improvements: Tenant to accept the Premises in "As Is" condition, with the exception that Landlord shall contribute a maximum of a $35,000.00 Tenant Improvement Allowance to be used only towards the installation of a new grease trap before December 31, 2019, unless otherwise mandated by the government. Tenant shall submit any and all contractor invoices prior to reimbursement for approval by Landlord before December 31, 2019. Any receipts received after December 31, 2019 will not be reimbursed. All improvements shall be subject to landlord approval prior to commencement of work. Any additional required improvements shall be at Tenant's sole cost and expense.

7. Signage: Tenants may submit plans for an exterior sign to be placed on the corner of Pensacola Street and Kapiolani Blvd. for Landlord's review and approval. All signage will be at Tenant's sole cost.

8. Pest Control: Tenant shall be required to contract a licensed pest control company for the Premises. All pest control service slips must be forwarded to the Management Office and kept on file.

9. Insurance: Tenant agrees to carry and maintain comprehensive General Liability Insurance covering the Landlord and Tenant with respect to the demised premises, at Tenant's expense. Such insurance is to be written by a company of Tenant's choice, licensed to do business in Hawaii and to have the minimum limits as set forth in the Lease document. Tenant shall furnish Landlord with current certificates of such insurance, and shall name Landlord, the Management Agents, and Ground Lessors as Additional insured.

10. Defaults: Tenant hereby represents and warrants to Landlord that, as of the date of this Amendment, Tenant is in full compliance with all terms, covenants and conditions of the Lease and that there are no breaches or defaults under the Lease by Landlord or Tenant, and that Tenant knows of no events or circumstances which, given the passage of time, would constitute a default by the Landlord under the Lease as amended by this Amendment.

11. No Further Modification: Except as set forth in this Amendment, all of the terms and provisions of the Lease shall apply with respect to the extension and shall remain unmodified and in full force and effect. Effective as of the date hereof, all references to the "Lease" shall refer to the Lease as amended by this Amendment.

Except as modified herein, all of the terms, conditions and covenants of the existing Lease and any previous amendments thereto shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment as of the date first hereinabove stated.

LANDLORD

FPA Kapiolani Associates LLC
a Delaware limited liability company

By its Manager: GF Kapiolani LLC
a Delaware limited liability company

Michael B. Earl, Manager

TENANT

Pancakes of Hawaii, Inc.
a Hawaii corporation

By: _____

Name Printed: Young Acapan

Its: PRES.