OFFICE OF THE UNITED STATES TRUSTEE

TIFFANY L. CARROLL
Acting United States Trustee
CURTIS CHING          3931
Assistant United States Trustee
NEIL VERBRUGGE        7478
Trial Attorney
300 Ala Moana Boulevard, Room 4108
Honolulu, Hawaii  96850
Telephone:  (808) 522-8155
ustpregion15.hi.ecf@usdoj.gov

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF HAWAII**

| | |
|---|---|
| In re<br><br>PANCAKES OF HAWAII, INC.,<br><br>    Debtor and Debtor-in-possession. | Case No. 23-00386<br>(Chapter 11) (Subchapter V)<br><br>Continued Hearing:<br>Date:  February 26, 2024<br>Time:  2:00 p.m.<br>Judge: Hon. Robert J. Faris<br><br>[Related Docket Entry:  Dkt. #64] |

**UNITED STATES TRUSTEE'S SUPPLEMENTAL STATEMENT REGARDING DEBTOR'S SMALL BUSINESS PLAN OF REORGANIZATION**

    The United States Trustee, by and through her attorney, hereby submits this

Supplemental Statement regarding the Debtor and debtor-in-possession Pancakes

1

of Hawaii Inc.'s (the "Debtor") Small Business Plan of Reorganization; Exhibits 1-5 (the "Plan") filed on August 22, 2023, Dkt. #64.[1]

## I. PROCEDURAL BACKGROUND

1. On May 24, 2023, at 4:41 p.m., Debtor filed a voluntary petition under chapter 11.

2. On August 22, 2023, Debtor filed its Plan. The deadline to file objections to the plan was November 27, 2023.

3. On November 27, 2023, Landlord FPA Kapiolani Associates LLC ("FPA") filed its objection.

4. On December 4, 2023, Debtor filed its Confirmation Brief, Dkt. #77, and Declaration of Young Acopan, Dkt. #78. Debtor's Confirmation Brief, and the Declaration of Young Acopan disclose that Ms. Young Acopan paid, between the *post-petition* period May and June 2023 "at least $192,287 of the Debtor's liabilities from her personal checking account".

5. As of December 11, 2023, Debtor had not filed its October 2023 Monthly Operating Report ("MOR") (which was due to be filed on November 21, 2023).

---

[1] The United States Trustee has authority and standing to make this statement since its responsibilities include, among other things, supervising "the administration of cases … under Chapter 11" of the Bankruptcy Code. 28 U.S.C. § 586(a)(3). The United States Trustee is given discretion to file comments with the Court with respect to plans and disclosure statements. 28 U.S.C. § 586(a)(3)(B).

6. On December 11, 2023, the Court held a plan confirmation hearing. The Court continued the plan confirmation hearing to February 26, 2024.

7. On December 12, 2023, Debtor filed its October 2023 MOR.

II. **UNITED STATES TRUSTEE'S SUPPLEMENTAL COMMMENTS REGARDING DEBTOR'S PLAN**

    1. <u>As a result of Ms. Acopan's credit card transactions, Debtor's MORs may understate its expenses.</u>

Debtor and Ms. Acopan appear to have completed some irregular transactions in this case. Debtor's petition was filed at 4:41 p.m. on May 24, 2023. Sometime on May 24, 2023, Ms. Acopan withdrew $150,000 from Debtor's ASB Account #5545 and deposited the $150,000 into her personal checking account ASB #0549 ("Young Acopan c/o Original Pancake House").[2] It is unclear if Ms. Acopan withdrew the $150,000 before or after the petition was filed.[3] In Debtor's Confirmation Brief, Debtor contends that Ms. Acopan has an "unfiled"

---

[2] Debtor's MOR for May 2023, belatedly filed on July 10, 2023, Dkt. #57-1, shows Ms. Acopan's withdrawal of $150,000 from Debtor's account into her personal account.

[3] If the transaction took place during normal business hours, then it is possible the $150,000 withdrawal occurred pre-petition. However, with electronic, online transactions, it is possible the $150,000 withdrawal took place post-petition.

administrative expense claim of approximately $42,000.[4]  However, it is unclear the basis for her "unfiled" administrative expense claim.

It appears Ms. Acopan had significant pre-petition credit card balances, and also carried post-petition credit card balances, on her Costco Citi Card.  Although Debtor's Schedule H identifies Young Acopan as co-debtor on a Capital One card, and a Costco Consumer & Costco Small Business card, and although the charges on the Costo Citi Card may have benefitted the Debtor, it is not clear the amounts owed on the Costco Citi Card are actually Debtor's liabilities because this card appears to be in Ms. Young Acopan's name.  Specifically, the Costco Citi card is in the name of "Young Acopan Pancakes of Hawaii" and does not reference "Inc.".[5]

Debtor's Confirmation Brief, Dkt. #77, and Declaration of Young Acopan, Dkt. #78, filed on December 4, 2023, both reference Ms. Acopan paying, between the post-petition period of May and June 2023 "at least $192,287 of the Debtor's liabilities from her personal checking account".  Ms. Acopan's Declaration and exhibits shows, inter alia, she made the following payments on the following credit

---

[4] It appears the $42,000 amount is the difference between the $192,287 Ms. Acopan claims to have paid towards credit cards, and the $150,000 she withdrew from Debtor's account on May 24, 2023.

[5] Ms. Acopan's Declaration did not appear to attach any credit card statements from Capital One.

4

cards: (1) June 2, 2023: Costco Citi Card $62,880.04 (check dated 5-24-23), (2) June 2, 2023: Capital One: $60,000 (check dated 5-24-23), (3) July 4, 2023, Costo Citi Card $45,512.51. The payments made by checks dated 5-24-23 appear to be for pre-petition debts. The payments made on July 4, 2023 could be for post-petition debts (although this is not certain).

To the extent Ms. Acopan incurred credit card debts in her name pre-petition, and Ms. Acopan's withdrawal of the $150,000 took place pre-petition, then, as Landlord points out, it is possible the amounts withdrawn may be considered an avoidable preference (if she was a pre-petition general unsecured creditor of the Debtor) or a transfer lacking reasonable equivalent value (if her payment of the credit cards would otherwise typically be treated as an equity contribution).

To the extent the credit card debts were incurred in Ms. Acopan's name pre-petition, and Ms. Acopan's withdrawal of the $150,000 from the Debtor took place post-petition, then it may be possible the transfer is avoidable as an unauthorized post-petition transaction under Section 549.

To the extent the credit card debts were incurred in Ms. Acopan's name post-petition (potentially the July 4, 2023 credit card payment), and Ms. Acopan's withdrawal of the $150,000 took place post-petition, Debtor never obtained authorization under Section 364 to obtain post-petition financing, from Ms.

5

Acopan, outside of the ordinary course of business, as an administrative expense. To the extent Ms. Young Acopan advanced credit card "financing" to the Debtor for payment of Debtor's expenses, without Court approval, then Ms. Acopan should explain why these funds should not be considered an equity contribution. Even if the Debtor obtained, in the ordinary course (which would be unusual for an "insider" loan), unsecured credit (and not equity contributions) from Ms. Acopan, then any loans from Ms. Acopan to Debtor would appear to be at most entitled to be an unsecured claim, and not an administrative expense claim.[6]

Furthermore, it is not clear if Ms. Acopan's payment of approximately $42,000 in alleged Debtor liabilities is accounted for in Debtor's MORs. If not, then Debtor's financial condition as reflected in its MORs may understate its expenses and overstate its ability to generate net income. It appears that only recently has Debtor included payment on the credit cards in its MORs. Debtor's MOR for September 2023 (which was due to be filed on October 21, 2023, and belatedly filed on November 6, 2023) shows a disbursement on September 29, 2023, from Debtor's ASB Account #5702 ("DIP Operating Account") to "Citi

---

[6] Debtor does not appear to intend to include Ms. Acopan, who has not filed a proof of claim, in the impaired Class 2: General Unsecured Creditors who will share "pro-rata" in the plan's proposed payments totaling $250,000.

6

U.S. Bankruptcy Court - Hawaii   #23-00386   Dkt # 84   Filed   12/14/23   Page 6 of 11

Cards" for $56,662.95.[7] See p. 13 of 24 of September 2023 MOR. Debtor's MOR for October 2023 (which was due to be filed on November 21, 2023, and belatedly filed on December 12, 2023), and Debtor's DIP Account #5702 (DIP Operating Account) shows check #366 in the amount of $56,662.95 that was paid on October 5, 2023.

2. Debtor's Plan Projections only cover one (1) year.

In this case, because not all impaired classes voted in favor of the plan under Section 1129(a)(8), the Debtor should not be able to confirm a consensual plan under Section 1191(a), but should only be able to confirm the plan non-consensually under Section 1191(b). See Dkt. #79 (Ballot Tabulation).[8] In order

---

[7] As discussed above, it is an open question whether Debtor's payment of $56,662.95 on account of the Costco "Citi Card" should be considered a payment on credit in the Debtor's name, on credit in Young Acopan's name, or on credit in both Debtor's and Young Acopan's name.

[8] Debtor's Plan identified approximately "$8,700 in unsecured claims that have been filed against the Debtor as of August 2, 2023 (excluding the approximately $345,0900 claim filed by the landlord for the Kapiolani location)." See Plan at p. 3, Section 1.6 (Debtor's Liabilities). Debtor's Plan identifies a single impaired class: Class 2 General Unsecured Class. The Ballot Tabulation stated that plan solicitation packages were mailed, but no creditor voted or returned a ballot. Because no impaired class affirmatively voted to accept the plan, the Debtor is unable to satisfy Section 1129(a)(8). See *In re M. Long Arabians*, 103 B.R. 211, 215–16 (B.A.P. 9th Cir. 1989) (reversing and remanding to bankruptcy court for a determination of whether debtor's plan complied with "cram-down" requirements where bankruptcy court erroneously concluded Section 1129(a)(8) had been satisfied although not all impaired classes had voted to accept the plan, and reasoning that impaired class must affirmatively vote to accept plan). Despite not being able to satisfy Section 1129(a)(8), the Debtor may seek confirmation of a non-consensual plan under Section 1191(b).

to meet the "cramdown" requirements of Section 1191(b), the Debtor must establish its non-consensual plan does not "discriminate unfairly"[9] and is "fair and equitable".[10] Although the debtor is not required to satisfy the "absolute priority rule" applicable in a regular (non-Subchapter V) chapter 11 case, the Debtor must show, with respect to an impaired non-consenting class of general unsecured creditors, as of the effective date of the plan, the plan provides that (a) all of the debtor's projected disposable income[11] for the three- to five-year period (as fixed by the Court) will be applied to make payments under the plan, *or* (b) the value of the property to be distributed under the plan during the three to five-year period is not less than the projected disposable income of the debtor. *See* 11 U.S.C. § 1191(c)(2). Thus, if the Debtor seeks to confirm its plan non-consensually under

---

[9] The standards for the "unfair discrimination" prong are the same as under section 1129(b)(1) applicable to other chapter 11 cases.

[10] The definition of what is "fair and equitable" under Section 1191(c), with respect to unsecured creditors, is different in a Subchapter V case, and the "absolute priority rule" (inherent in subsections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii)) does not apply in a Subchapter V case.

[11] For purposes of 11 U.S.C. § 1191(c)(2)(A), "disposable income" is defined as *income* received by the debtor *that is not reasonably necessary to be expended for* the maintenance or support of the debtor or a dependent of the debtor, for a post-petition domestic support obligation, *or for the payment of necessary business expenditures*. *See* 11 U.S.C. § 1191(d).

Section 1191(b), then Debtor should provide projections that cover at least a three-year period (2024, 2025, and 2026).[12]

Here, Debtor's projections attached to the plan only cover a one-year time period from January to December 2024.[13] Debtor's one-year plan projections show total one-year (2024) "net ordinary income" of $126,535.69 (before proposed plan payments, professional fees, and quarterly income tax payments of $35,000)

---

[12] Although the resolution of the Landlord's claim is pending, for purposes of preparing projections, it is worthwhile to note that although Section 1191(e) permits deferred payment of certain administrative expense claims allowed under Section 503(b), Section 1191(e) does not apply to post-petition administrative rent obligations. *See In re Seven Stars on the Hudson Corp.*, 618 B.R. 333, 346 n. 82 (Bankr. S.D. Fla. 2020) (reasoning that because Section 1191(e) specifically refers to claims of a kind specified in paragraphs (2) or (3) of Section 507(a), and Section 507(a)(2) then refers to administrative expenses allowed under Section 503(b) (and Section 507(a)(3) refers to claims arising under Section 502(f) in involuntary cases, which was inapplicable), and nowhere in Section 503(b) is there any mention of post-petition rent obligations, debtor's obligation to pay unpaid administrative rent is not the type of administrative expense claim that would qualify for deferred payment over the term of the plan treatment under Section 1191(e) because this obligation is governed solely by Section 365, not by Section 503(b)).

[13] Section 1190(1)(C) requires Debtor's Plan include projections with respect to the ability of the debtor to make payments under the proposed plan. Debtor's Plan proposes to pay Class 2 – General Unsecured Creditors pro rata share of $250,000 (with $82,027 paid on the effective date, and $167,973 paid after the resolution of the Debtor's objection to the Landlord's claim). Debtor's plan projections show a January 2024 plan payment of $83,127, and a December 2024 plan payment of $167,972.37. However, Debtor's proposed payments, which appear designed to satisfy Section 1129(a)(7)'s "best interest of creditors" test, do not necessarily satisfy the "cramdown" requirements of Section 1191(b)-(c).

ranging from -$4,386.68/mth to $19,967.43/mth, with an average of $10,544.64/mth). The accuracy of Debtor's MORs is relevant to understanding Debtor's financial condition and understanding whether Debtor's one-year plan projections have a basis in its historical performance. Debtor's MORs show (on cash basis):

|  | Cash Receipts | Cash Disbursements | Net Cash Flow |
|---|---|---|---|
| May 2023 | $39,261.76 | $45,894.41 | -6,632.65 |
| June 2023 | $147,496.80 | $56,195.42 | $91,301.38 |
| July 2023 | $175,350.68 | $100,374.94 | $74,975.74 |
| August 2023 | $149,400.13 | $147,937.57 | $1,462.56 |
| September 2023 | $129,036.53 | $83,454.08 | $45,582.45 |
| October 2023 | $149,257.05 | $140,986.82 | $8,270.23 |

However, to the extent Debtor's MORs understate its expenses and cash disbursements, its net cash flow may also be overstated. On the one hand, overstated net cash flow (due to understated expenses) may support a conclusion that Debtor's PDI may likely not exceed the proposed liquidation value payments, and payment of liquidation value is adequate to meet the "cram-down" requirements. On the other hand, the lack of plan projections showing total projected disposable income for at least a three-year period (2024, 2025, and 2026) makes it impossible to conclude the Debtor has satisfied Section 1191(c)(2).

## III. CONCLUSION

The United States Trustee reserves her right to be heard at the continued hearing on plan confirmation, and requests that any form of order confirming the plan be circulated to counsel for approval as to form.

DATE: Honolulu, Hawaii, December 14, 2023.

Tiffany L. Carroll
Acting United States Trustee

By /s/ Neil Verbrugge
Trial Attorney